Jeffrey I. D. Lewis
John P. Figura
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 336-2000
Fax:  (212) 336-2222

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRANK J. FERTITTA III and EYKYN MACLEAN, LP,<br><br>                     Plaintiffs,<br><br>    vs.<br><br>KNOEDLER GALLERY, LLC d/b/a KNOEDLER & COMPANY; 8-31 HOLDINGS, INC.; MICHAEL HAMMER; ANN FREEDMAN; JAIME ANDRADE; GLAFIRA ROSALES; JOSÉ CARLOS BERGANTIÑOS DIAZ; JESUS ANGEL BERGANTIÑOS DIAZ; OLIVER WICK; URS KRAFT; and John Does # 1 to 10,<br><br>                    Defendants. | Civil Action No. 14-cv-02259-JPO |

## AMENDED COMPLAINT

Plaintiffs Frank J. Fertitta III and Eykyn Maclean, LP, by and through their undersigned attorneys, allege as follows:

## NATURE OF THE ACTION

1.     This action concerns the sale of forged art.  In April 2008, plaintiffs purchased a painting, *Untitled (Orange, Red and Blue)* purportedly created by the well-known American artist Mark Rothko in 1959 (the "Painting").  In reality, the Painting is a forgery,

fraudulently sold by one or more of defendants, as part of a series of forged artworks sold by one or more of the defendants over the course of fourteen years.  At least some of defendants conspired in a coordinated, concerted effort to defraud art collectors of tens of millions of dollars through the sale of forged artwork.

2.      Plaintiffs purchased the Painting without knowledge of the fraud, believing it to be a genuine Rothko.  Plaintiffs first received information suggesting that the Painting was not authentic in November 2013 when it was publicly identified as a forged work in one or more press reports.

3.      Accordingly, this is an action (a) to rescind the April 2008 sale of the Painting based upon mutual mistake; (b) for violation of the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"); and (c) for various common-law and statutory causes of action based on defendants' fraud and breach of warranty.  Plaintiffs bring this action against defendants for compensatory and punitive damages arising from their fraudulent sale of the Painting and their operation of a corrupt enterprise.

## **THE PARTIES**

4.      Plaintiff Frank J. Fertitta III is an individual residing in Las Vegas, Nevada.

5.      Plaintiff Eykyn Maclean, LP is a limited partnership organized under the laws of New York with its principal place of business in New York City.

6.      Defendant Knoedler Gallery, LLC, doing business as "Knoedler and Company" (collectively, "Knoedler"), is a limited liability company organized under the laws of the State of Delaware.  Its principal place of business has been recorded with the New York Secretary of State as 19 East 70th Street, New York, New York.  Knoedler was one of the

world's pre-eminent art galleries and was reputed to be New York City's oldest art gallery before it closed without notice in or about December 2011.

7.       On information and belief, defendant Michael Hammer is an individual residing in or near Santa Barbara, California.

8.       On information and belief, defendant Ann Freedman is an individual residing in New York, New York.

9.       On information and belief, defendant Jaime Andrade is an individual residing in New York, New York.

10.      Defendant 8-31 Holdings, Inc. ("8-31") is a corporation organized under the laws of the State of Delaware.  Its principal place of business has been recorded with the New York Secretary of State as 19 East 70th Street, New York, New York.

11.      On information and belief, Hammer is, and at all relevant times was, the sole owner of 8-31 and its President.  In his capacity as President of 8-31, Hammer was the sole member and sole owner of Knoedler and, on information and belief, at all relevant times directed Knoedler's operations acting on behalf of himself, Knoedler, and 8-31.

12.      8-31 is believed to have been the direct employer of Freedman and Andrade.

13.      Freedman was employed by 8-31 and Knoedler and served as Knoedler's Director and President at all relevant times until her dismissal in the fall of 2009.

14.      Andrade was employed at all relevant times by both Knoedler and 8-31 and was paid by 8-31.

15.      Defendant Glafira Rosales, also known as "Glafira Gonzales" or "Glafira Rosales Rojas," is an individual residing in Sands Point, New York.  Rosales pled guilty in this

District on September 9, 2013 to a 9-count indictment for her conduct at issue in this case, but she remains at liberty.

16.     Defendant Jose Carlos Bergantiños Diaz, an individual, is a citizen of the United States and Spain whose last known residence in the United States was in Sands Point, New York, and who, on information and belief, currently is in Seville, Spain.  He was indicted in this District on March 31, 2014 in connection with the conspiracy described herein and was arrested in Spain on or about April 18, 2014.  On information and belief, he is awaiting extradition proceedings.

17.     Defendant Jesus Angel Bergantiños Diaz is an individual citizen of Spain who, on information and belief, currently resides in Lugo, Spain.  He was indicted in this District on March 31, 2014 in connection with the conspiracy described herein and was arrested in Spain on or about April 14, 2014.  On information and belief, he is also awaiting extradition proceedings.

18.     Defendant Oliver Wick is an individual residing in Zurich, Switzerland. On information and belief, he served as a paid agent for Knoedler, Rosales, Jose Carlos Bergantiños Diaz, and/or Jesus Angel Bergantiños Diaz in their dealings with plaintiffs concerning the Painting.

19.     On information and belief, defendant Urs Kraft is an individual residing in Switzerland, who maintains a regular address in Kilchberg, Switzerland.

20.     Defendants John Doe #1 to #10 are parties as yet unknown who participated in the matters complained of herein.

21.     The buyer of the Painting was Fertitta, acting through Gurr Johns.  Gurr Johns has assigned its claims to Fertitta.

22.     On information and belief, the Painting was sold by one or more of the named Defendants, operating through Kraft.

## JURISDICTION AND VENUE

23.     The sale of the Painting occurred within the jurisdiction of the State of New York, by virtue of the Bill of Sale (Exhibit A hereto) reciting that the Bill of Sale, and therefore the sale, "shall be governed by and shall be construed and enforced in accordance with the laws of the State of New York."

24.     This Court has personal jurisdiction over defendants pursuant to

N.Y.C.P.L.R. § 301.  To the extent that any defendant is not located in the State of New York, this Court also has personal jurisdiction pursuant to N.Y.C.P.L.R. § 302(a) because this action arises out of the transaction of business in the State of New York and defendants committed a tortious act in the State of New York.

25.     This Court also has jurisdiction over Kraft by virtue of the Bill of Sale reciting, "[T]he parties hereto submit to the sole and exclusive jurisdiction and venue of the courts of the County of New York, State of New York, Southern District."

26.     The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

27.     In addition, the Court has federal question jurisdiction over the RICO claims in this action pursuant to 18 U.S.C. § 1964(a) and 28 U.S.C. § 1331, and over the remaining claims pursuant to 28 U.S.C. § 1367(a).

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in this District and because it is the identified venue in the Bill of Sale.

## FACTUAL ALLEGATIONS

**Origins of the Scheme**

29.     In the late 1980s or early 1990s, Jose Carlos Bergantiños Diaz encountered an obscure but highly skilled painter named Pei-Shen Qian selling art on the street in New York City.  Mr. Qian is also under indictment in this District.  At the request of Jose Carlos Bergantiños Diaz and, on information and belief, also on the request of Rosales and Jesus Angel Bergantiños Diaz, Qian created a series of paintings mimicking the styles of renowned Abstract Expressionist painters.

30.     Jose Carlos Bergantiños Diaz obtained old paint, canvases, and other materials to make the paintings appear authentic.  He gave these materials to Qian so that Qian could create the paintings.

31.     Jose Carlos Bergantiños Diaz paid Qian amounts ranging from a few hundred to several thousand dollars for each painting.  On certain occasions Jose Carlos Bergantiños Diaz paid Qian in cash.  At other times he paid for the paintings by arranging international wire transfers from an account at a bank in Spain.  His brother, Jesus Angel Bergantiños Diaz, had access to this account from at least as early as 2007 to at least as late as 2011.

32.     At various times relevant to this Complaint, after Qian completed the works, Rosales, Jose Carlos Bergantiños Diaz, and/or Jesus Angel Bergantiños Diaz retrieved paintings from Qian at Qian's home in Queens and delivered them to a home shared by Rosales and Jose Carlos Bergantiños Diaz in Sands Point, Long Island, NY.

33.     Rosales and Jose Carlos Bergantiños Diaz lived together and were romantically involved.  From about 1995 until about 2010 they operated King's Fine Arts, Inc.,

an art gallery in Manhattan.  From about 2006 until about 2009 they also operated a second

business, Glafira Rosales Fine Arts LLC.

34.     Jose Carlos Bergantiños Diaz forged the signatures of the artists who

purportedly created the paintings and used chemicals and other techniques (including tea bags) to

artificially age the paintings, making them appear to be original works by famous artists.  On at

least one occasion, in the presence of Jesus Angel Bergantiños Diaz and Rosales in the home on

Long Island, Jose Carlos Bergantiños Diaz aged one of the works by, *inter alia*, heating it with a

blow dryer.

35.     In the mid-1990s, Andrade introduced Rosales to Freedman, who was then

Knoedler's President.  Andrade described Rosales as "a very good friend."  Rosales proceeded to

show Freedman counterfeit paintings and to provide false provenance for each such painting.  On

Freedman's instruction, Knoedler bought the paintings from Rosales and Jose Carlos

Bergantiños Diaz.

36.     Among the counterfeit paintings that Rosales and Jose Carlos Bergantiños

Diaz sold to Knoedler early in their relationship were two paintings that were purportedly the

work of the artist Richard Diebenkorn.  In or around 1994, however, Freedman was informed by

Diebenkorn's widow and son-in-law (who is also the Executive Director of the Diebenkorn

Foundation) that the two paintings appeared to be forgeries.  On information and belief,

Freedman and Knoedler proceeded to market these paintings and did not disclose to prospective

buyers that they had been identified as apparent forgeries by the widow and son-in-law of the

artist to whom Rosales attributed the works.

37.     Later in 1994, Rosales told Freedman that she and Jose Carlos Bergantiños

Diaz had access to a collection of "previously undiscovered" Abstract Expressionist paintings by

renowned American artists, including Mark Rothko, Jackson Pollock, Willem de Kooning, Robert Motherwell, Clyfford Still, and Barnett Newman.  Rosales said these works (the "Rosales Collection") had been acquired between the late 1940s and 1964 (or, alternately, in the late 1950s and early 1960s, depending on which story Rosales told) by an art collector who had lived in Switzerland and Mexico and who traveled to the United States frequently on business. Rosales said she encountered this collector, to whom she referred as "Mr. X," when she was a child growing up in Mexico.

38.     Rosales had no sales documents or other support or corroboration for the provenance of the works of Mr. X's collection.  She explained to Freedman that no such documentation had been generated because Mr. X had paid for the works in cash.  Rosales claimed that Mr. X had communicated with the artists through written letters but that his son (called "Mr. X, Jr.") had probably destroyed the letters after Mr. X's death.

39.     Rosales's story was fictional in its entirety.  The paintings were forgeries, newly created in Qian's home in Queens, New York.  Mr. X and his son did not in fact exist.

40.     On information and belief, Rosales and the Bergantiños Diaz brothers created the story of Mr. X for the purpose of selling the fake paintings to Knoedler and Freedman.

41.     On information and belief, Freedman has admitted that she did not investigate the bona fides of Rosales or Jose Carlos Bergantiños Diaz or their claims of the provenance of each work.  If Freedman had done so, she would have discovered that Jose Carlos Bergantiños Diaz had previously been implicated in the sale of forged artwork.

42.     Rosales's fabricated story was so far-fetched that Hammer and Freedman, who were highly experienced in the purchase and sale of artwork, could not have reasonably

believed it to be true.  On information and belief, they instead knowingly participated in the sale of forgeries from the Rosales Collection directly and through both Knoedler and 8-31 (collectively, Knoedler, Hammer, Freedman, Andrade, and 8-31 are referred to hereinafter as the "Knoedler Defendants").

43.     In particular, Hammer and Freedman knew that it was extremely implausible that, as Rosales claimed, (1) Mr. X had secretly acquired a vast store of valuable artwork directly from renowned American painters; (2) this purported enthusiast chose not to display or publicize the works but instead hid them from the art world; (3) his son, Mr. X, Jr., once possessed letters between Mr. X and each of these artists but destroyed them, even though they would have dramatically enhanced the paintings' marketability; (4) the works were entirely unknown, with none of them having been mentioned in any art catalog, history, monograph or other documentary source; and (5) Mr. X, Jr. was so insistent on secrecy that he would not allow his or his father's identities to be disclosed to anyone, not even confidentially to Knoedler.

44.     Nonetheless, under the direction of Hammer, who acted individually and on behalf of 8-31 and Knoedler, in or around 1994 Knoedler and Freedman began buying works of the Rosales Collection from Rosales and the Bergantiños Diaz brothers through King's Fine Arts and Glafira Rosales Fine Arts.

45.     Knoedler typically paid for the works by giving a small portion of the proceeds to Rosales in cash and wiring the remainder to one of four accounts in Spanish banks, particularly the Caja Madrid bank or Banco Bilbao Vizcaya Argentaria, S.A..  The accounts were in either Rosales's name or Jose Carlos Bergantiños Diaz's name.  Jesus Angel Bergantiños Diaz had access to each of the four accounts.

46.     At various times, Rosales and the Bergantiños Diaz brothers transferred proceeds from the sale of the works to other bank accounts that they controlled from the four accounts at Caja Madrid and Banco Bilbao Vizcaya Argentaria.  On or about December 27, 2011, for example, it is believed that Rosales and Jesus Angel Bergantiños Diaz caused approximately $165,000 in proceeds from the scheme to be transferred from a Caja Madrid Account to an account in Jesus Angel Bergantiños Diaz's name at CaixaBank in Spain.

**Knoedler and Freedman's Misrepresentations and Knowledge of the Fraud**

47.     On or about June 18, 1998, Freedman and Rosales held a meeting at which they discussed, in the presence of Knoedler employee Melissa de Medeiros, the inventory of paintings from Mr. X's collection to which Rosales then had access.  As recorded by de Medeiros, Rosales identified five to eight works that were still available.  The number of paintings that Rosales eventually supplied to Knoedler from the Rosales Collection, however, was far in excess of the five to eight that Rosales identified at the June 1998 meeting. Eventually, by the time the fraud was uncovered years later, Rosales had delivered to Freedman about 25 additional paintings that Rosales claimed had emanated from Mr. X's collection.

48.     In or around 2000, Freedman questioned Rosales about her claim that Mr. X had acquired the paintings directly from their creators.  Apparently recognizing it would have been highly unlikely, if not physically impossible, for Mr. X to have purchased the works directly from each of the artists, Freedman told Rosales she "surmised" that Mr. X instead had acquired the works through an intermediary, Alfonso Ossorio (an artist and collector).  Rosales later told Freedman that Mr. X, Jr. had confirmed Freedman's conjecture.

49.     Knoedler's employees and retained experts attempted to verify the Ossorio story by, among other things, reviewing papers relating to Ossorio and Pollock at the

Smithsonian Archives of American Art.  They could not do so.  They found no evidence linking Ossorio to Mr. X, to the Rosales Collection, or to any of the works in it.  Nonetheless, Knoedler and Freedman used the purported Ossorio link to the paintings, which Freedman had "surmised" was the manner in which Mr. X had obtained access to the works, as a tool to bolster the appearance of authenticity in marketing the paintings to prospective buyers without any verification.

50.     On information and belief, the story of Ossorio as intermediary was also adopted by Julian Weissman, an art dealer and former Knoedler employee, as a means of selling paintings from the Rosales Collection.

51.     On information and belief, Freedman drafted a short write-up for each painting from the Rosales Collection explaining its provenance.  Knoedler and Freedman used the write-ups for the purpose of marketing the paintings to potential customers.  In doing so, she generally informed customers that works from the Rosales Collection were originally acquired from the artist and passed "by descent" to the work's "current owner."  She did not state that the "current owner" of the works – in most cases, Knoedler itself – had acquired the works not "by descent" but by purchasing them from another third party intermediary – Rosales herself.

52.     On information and belief, Hammer was familiar with these write-ups. Hammer also knew when a painting from the Rosales Collection had been purchased outright by Knoedler or was being sold for Rosales on consignment.

53.     On information and belief, Freedman and Knoedler attempted to create an air of authenticity for the Rosales Collection paintings by showing them to recognized figures in the art world.  They then told Knoedler customers that these individuals had viewed the paintings and reviewed them favorably, implying that they had authenticated the works.

54.     Knoedler also arranged for some of the paintings to be displayed in museums and exhibits to lend credibility to each work's asserted provenance and to increase potential purchase prices.  On information and belief, Freedman wrote internal memos at Knoedler in which she discussed the provenance she imagined for each painting and the evidence that purportedly supported each such provenance.

55.     Among the documents maintained at Knoedler was a purported authentication document prepared on Knoedler letterhead, signed by Rosales, and dated May 26, 2001 (the "Authentication Statement").

56.     In the Authentication Statement, Rosales stated that she was "the authorized agent, as well as a close family friend, of a private collector residing in Mexico City and Zurich."  Rosales stated:  "For various personal reasons the owner prefers to remain strictly anonymous as the seller.  The art works [sic] were acquired by the current owner's father directly from the artist [sic] and were passed by inheritance to his immediate heirs (son and daughter)."  The Authentication Statement further claimed "that the owner has absolute clear legal title to the [works]."

57.     In or about December 2001, to induce at least one buyer, Jack Levy, to buy a Rosales-sourced Pollock painting, Knoedler and Freedman represented that it was a genuine Pollock acquired by its owner's father, a Swiss art collector, through Ossorio.  On information and belief, after Knoedler's lucrative sale of this Pollock to Levy, Hammer rewarded Freedman by increasing her profit-sharing percentage from 16 percent to 25 percent.

58.     On or about October 9, 2003, the International Foundation for Art Research sent Knoedler a report ("the IFAR Report") noting a number of "very convincing" "negatives" concerning the authenticity of Rosales's Pollock that Knoedler sold to Mr. Levy.

The report concluded:  "IFAR believes that too many reservations exist to make a positive attribution to Jackson Pollock."  Those reservations focused largely on the inability of IFAR to verify the purported provenance of the painting.  Among other things, the IFAR Report found it "inconceivable" that the Pollock had passed through Ossorio's hands but had never been added to the Pollock *catalogue raisonné*.  (A *catalogue raisonné* is a published work that serves as the authoritative list of recognized works by a given artist.)

59.    Freedman instructed that the IFAR Report be sent to Hammer.  Two executives of 8-31 and Knoedler later sent Hammer a memo acknowledging that the IFAR Report raised questions about the Pollock's "authenticity" and "authorship."  The memo to Hammer further noted that IFAR was "held in high esteem by galleries, museums and the art world in general."

60.    In the aftermath of the IFAR Report, the Knoedler Defendants repurchased Rosales's Pollock from Levy, as they were required to do under Knoedler's agreement with Levy if the painting was determined to be inauthentic.  Despite their awareness that the painting was a fake, the Knoedler Defendants persuaded a Canadian Gallerist, David Mirvish, to acquire an interest in the painting.

61.    In a document faxed to Hammer dated December 15, 2003, Freedman advised Hammer of the fallout from the IFAR Report and the willingness of Mirvish to invest in the painting.  On the reverse side of the document, Freedman handwrote the following sentences in quotation marks:  "'discreet sources are my stock in trade,'" "'don't kill the goose that's laying the Golden egg,'" and "'I am not going to change my way of doing business.  If you are not [comfortable] – step away.'"  It has been alleged that Freedman was quoting comments made by Hammer.

62.     Hammer has testified that the IFAR Report raised "questions" and "concerns" about the work – which he knew was part of the broader Rosales Collection. Hammer also testified that he reviewed documents concerning Knoedler's inability to verify the purported Ossorio link to Mr. X and the Rosales Collection.

63.     On information and belief, the Knoedler Defendants understood that, in light of the other red flags of fraud surrounding the Rosales Collection, if the "Pollock" sold to Levy could not be attributed by IFAR to Pollock – largely on the basis of the unverifiable provenance – then the Pollock was a forgery.

64.     On information and belief, the Knoedler Defendants understood that if this Pollock was a forgery, so too were the other works of the Rosales Collection, all of which shared the same mysterious and unverifiable provenance.

65.     After the IFAR Report rejected the story of Ossorio as intermediary as "inconceivable," the Knoedler Defendants developed a new provenance story to tell prospective purchasers.

66.     Andrade, who served as the "gateway" to Rosales and the Bergantiños Diaz brothers, had been a close friend of David Herbert, a deceased New York art dealer, and had served as the executor of Herbert's estate.  Andrade claimed that he had introduced Rosales to Herbert before Herbert's death in 1995.

67.     In or around November 2004, the Knoedler Defendants started telling customers that Herbert, not Ossorio, had acted as the intermediary between the artists and Mr. X.

68.     On information and belief, Freedman sought to make it appear that there was some support for the purported Herbert link to the Rosales paintings by adding copies of documents from Herbert's estate to Knoedler's Rosales Collection file and by creating memos

14

for this file that attempted to explain how Herbert was connected to each of the Rosales Collection artists.  None of the documents that Freedman added to the file actually tied Herbert to Mr. X as an intermediary or to any of the paintings in the Rosales Collection.  Nor did Andrade, the executor of Herbert's estate, provide any documents linking Herbert to Mr. X.  Andrade admitted in a deposition that he had never met anyone who fit the description of Mr. X.

69.   On information and belief, the Knoedler Defendants instructed Rosales to tell Weissman to revise his provenance tale similarly, replacing Ossorio's name with Herbert's, so that Knoedler and Weissman would have matching stories.

70.   The story of Herbert as intermediary was false.  On information and belief, Freedman, Andrade, and Hammer knew that it was false, given the discrediting of any connection of Ossorio to the paintings and the circumstances of the Rosales Collection sales.

**The Rothko Rooms and Wick's Promotion of the Story of Herbert as Intermediary**

71.   In the summer of 2005, the Knoedler Defendants promoted the story of Herbert as intermediary through Wick.

72.   Wick is recognized as a scholar of Abstract Expressionist art, particularly the paintings of Rothko.  From approximately 2003 to 2013, Wick was Curator at Large of the Beyeler Foundation in Basel, Switzerland, where he curated the Beyeler Foundation's annual Rothko Rooms exhibit.  He is the author or editor of numerous scholarly books about art, including *Rothko*, an illustrated monograph about Rothko's paintings that was published in January 2007.  In 2008, Wick co-curated a retrospective exhibition of Rothko's work at the Hamburger Kunsthalle, a prominent art museum in Hamburg, Germany.  Starting in June 2013, Wick was a Curator at the Kunsthaus Zürich in Zurich, Switzerland.  The Kunsthaus Zürich stated that Wick "has probably the most extensive international network of any Swiss exhibition

organizer." Wick resigned as Curator at Kunsthaus Zürich shortly after this lawsuit was filed in April 2014.

73.     Wick had an ongoing relationship with Knoedler and showed at least two forged paintings from the Rosales Collection at the Beyeler Foundation.

74.     On information and belief, the first occasion on which Wick showed a fake Rothko at the Beyeler Foundation was in spring 2002, when he included a painting from the Rosales Collection in the Rothko Rooms exhibit. Knoedler had bought this forgery from Rosales the preceding January for in excess of $700,000. Knoedler prepared a write-up for the work that stated, falsely, that it belonged to an undisclosed private collection in Switzerland and had been "acquired directly from the artist through Alfonso Ossorio." On information and belief, Knoedler discussed this purported Ossorio connection with Wick, and at least one fake Rothko painting displayed in this exhibit was sold based upon these false representations.

75.     On information and belief, Wick conducted no independent research into the authenticity of this fake Rothko from the Rosales Collection shown at the Beyeler Foundation in 2002. If he had, he would have learned that the story of its having been acquired through Ossorio lacked any factual support.

76.     In or about summer 2005, Wick showed another fake Rothko painting from the Rosales Collection at the Beyeler Foundation. Wick was advised that this second painting was from the same unidentified Swiss collector who had acquired the fake Rothko that Wick showed at the Beyeler Foundation in in 2002. But while the 2002 Rothko was purportedly acquired through Ossorio, the 2005 Rothko was purportedly acquired through Herbert, following the new story of Herbert as intermediary that Freedman and Knoedler had developed in 2004.

77.     Wick wholeheartedly endorsed the new Herbert as intermediary story.  In a 2005 article entitled "Mark Rothko Rooms at Foundation Beyeler:  Two Rediscovered Paintings" ("Rothko Rooms Article"), published in Wick's name, he explained how Mr. X purportedly had acquired the paintings through Herbert:

> The ... painting, *Untitled*, 1956 [a forged Rothko], remained unrecorded in a private collection for nearly fifty years after its execution, and is presented here for the first time in the context of further Rothko paintings. …  The color, brilliantly fresh ... .

> The collector, long since deceased, regularly travelled through the U.S. in the 1950s and acquired a small group of works by artists of the New York School.  He was anything but a collector in the conventional sense. ... [H]e obtained professional advice from David Herbert.  Herbert (1920–1995) was a leading figure on the New York art scene, especially between 1950 and 1960. ... This placed him in the midst of the first commercial successes of the Abstract Expressionists ....  [H]e frequented the artists' studios.  He became a friend, companion and advisor to Mark Rothko. ...  In addition, Herbert furthered "his" artists by mounting private "apartment exhibitions[]" ....  It can be assumed that the work on view here was acquired at such an apartment sale …. (The same collection contained a second unknown Rothko, likewise *Untitled*, 1956 [also forged], which we were able to show in spring 2002 in the Rothko Rooms and which is now in the collection of the Hilti Art Foundation.)

78.     Wick did not explain in this article that the "second unknown Rothko" that had been shown in 2002 purportedly had been acquired through Ossorio, not Herbert, even though he wrote that both it and fake Rothko shown in 2005 were from "[t]he same collection" amassed by Mr. X.

79.     Wick did not author the passage quoted above in any meaningful sense.  Most of it came from a Knoedler memorandum purportedly about Mr. X and Herbert, entitled "Notes on a Collector."  Wick paraphrased significant portions of the memorandum and copied other parts verbatim.  He did not attribute the passage to Knoedler, but instead signed his own name to the article and passed it off as his own work and research.

80.     On information and belief, Wick made no effort to verify the accuracy of the copied passages, nor did he independently research Mr. X or Herbert.  He did not require Knoedler to support its claims of the provenance of the painting shown in 2005 or explain how Herbert had mysteriously replaced Ossorio as the link between Mr. X and Rothko.  If Wick had required any such support, he would have learned that there was no evidence indicating that Herbert had acquired paintings for Mr. X – or that Mr. X even existed.

81.     The Knoedler Defendants distributed Wick's Rothko Rooms Article to prospective purchasers of Rosales Collection paintings as a means of promoting the purported Herbert intermediary link to the paintings' provenance.  Freedman told at least one prospective customer that by publishing the Rothko Rooms Article, Wick "has now launched the story of David Herbert and his significant role with the heretofore unpublished Rothko."

**The Dedalus Foundation's Debunking of the Herbert Story**

82.     In 2007, the Dedalus Foundation, Inc. ("Dedalus") examined, seriatim, seven purported Motherwell paintings from the Rosales Collection.  Knoedler had sold four of these works and represented them as having been acquired by Mr. X through Herbert.  The other three were sold by Weissman.

83.     In December 2007 and January 2008, on information and belief Dedalus advised Knoedler and Freedman that it believed all seven Motherwells were fakes, and it rejected Knoedler and Freedman's assertions that the paintings were sold through Herbert to Mr. X.

84.     On information and belief, Freedman informed Rosales in January 2008 that Dedalus had concluded that the Motherwells were "false, illegal, or part of a dishonest scheme" and stated that Knoedler needed a "bona fide defense" to respond to the allegations.  In or about spring 2008, Knoedler and Freedman asked Rosales to (a) sign a revised Authentication

Statement referring to Herbert's purported role as an intermediary and stating that the owner "guaranteed [the] authenticity" of the works in the Rosales Collection; (b) identify Mr. X and Mr. X Jr. to Knoedler on a confidential basis; and (c) ask Mr. X Jr. to sign a letter confirming the essential details of the paintings' provenance.

85.     According to notes taken by Knoedler employees, Rosales told Knoedler that she was "very comfortable about including David Herbert" because "the owner *has confirmed* that Herbert was the advisor" (emphasis in original).  Rosales refused, however, to sign "the authenticity clause," to identify Mr. X and his son, or even to purportedly ask Mr. X, Jr. to sign the proposed letter.  She said that asking Mr. X, Jr. to confirm the paintings' authenticity "might raise his hackles" and that she did "not want to jeopardize the relationship by pressuring him."

86.     On information and belief, Hammer was familiar with Dedalus's conclusions and knew that Rosales had refused to sign the revised authenticity statement and warned Freedman not to demand that Rosales disclose Mr. X's identity.

87.     Dedalus did not release its findings about the fake Motherwells to the public until at least October 2011.

**Defendants' Sale of the Painting to Plaintiffs in 2008**

88.     One of the fraudulent works sold by defendants was the Painting in dispute – a purported 1959 Rothko, *Untitled (Orange, Red, and Blue).*  Rosales consigned the Painting to Knoedler on or about March 1, 2008.

89.     Freedman drafted a document for Knoedler's files noting that although the Painting came from Mr. X's collection, it was owned by Rosales herself.  Freedman wrote that

the work was "owned jointly by [Rosales] and her brother-in-law, although originally from same collection as the other pictures."

90.     On information and belief, Hammer, who supervised Freedman and controlled Knoedler's operations, knew that Knoedler was selling the Painting for Rosales.

91.     In a departure from its previous practices, Knoedler did not disclose its involvement but sold the Painting anonymously (or through other parties) as the property of an "undisclosed seller."

92.     The Knoedler Defendants marketed (either directly or indirectly) the Painting to plaintiffs through Wick.

93.     In or about March 2008, Wick offered the Painting to Eykyn Maclean LP ("Eykyn Maclean") for sale to one of its clients.  As a result, Eykyn MacLean contacted its client Fertitta.

94.     Eykyn Maclean asked Wick to provide the provenance of the Painting. On April 7, 2008, Wick sent an email stating, falsely, that the Painting was "a[c]quired through David Herbert, New York, either 1959 or 1960 for Private Collection Switzerland [sic]" and that it passed to its current owners "by descent."  Wick added a quote he attributed to the National Gallery of Art, which was at the time compiling a *catalogue raisonné* of Rothko's work:  "'The work has been viewed by the catalogue raisonne team and it is being considered for inclusion in the catalogue raisonne[.]'"  Wick concluded by stating, "I confirm that this work has been submitted to the team, all is perfectly fine, otherwise I would not want to be involved with it. For this I stand with my name as a Rothko scholar.  Besides this, the work was submitted to [the artist's son] Christopher Rothko, who as we all [are], was enthusiastic about it and the pristine wonderfully fresh condition."

95.     The statements in Wick's email (quoted above) were false and misleading. The Painting was not a Rothko and had not been acquired through Herbert.  It also did not pass "by descent" to its present owner.  The Painting was a forgery, and its provenance was fiction.  It was never authenticated by Christopher Rothko.  Moreover, members of the National Gallery had not "viewed" the Painting nor "consider[ed]" it for inclusion in the Rothko *catalogue raisonné*.  (As Freedman averred in a complaint filed in September 2013, she merely "showed a photograph" of the Painting to two National Gallery employees.)

96.     Wick was aware of substantial evidence that the Painting was a forgery and that the statements in his April 7, 2008 email were false.  Wick made these misrepresentations either intentionally or with willful blindness or reckless disregard for the truth.

97.     On information and belief, the Knoedler Defendants were aware that Wick was falsely promoting the Painting to plaintiffs as a Rothko acquired through Herbert.

98.     In addition to these misrepresentations, neither Wick nor the Knoedler Defendants conveyed to plaintiffs any other facts that would have indicated that the Painting was a forgery.  They did not disclose, for example, that the Painting was from the Rosales Collection,  They did not disclose that the Knoedler Defendants had purchased Rosales Collection works for a pittance and then resold them for huge markups.  Nor did they disclose that, by 2008, eight other works from the Rosales Collection had been determined to be inauthentic – *i.e.*, forgeries – by IFAR and Dedalus.

99.     Eykyn Maclean was familiar with Wick through, *inter alia*, Wick's scholarship and his work as curator of the Beyeler Foundation museum.  On information and belief, Wick's career and his reputation as a scholar and curator are based on his ability to

carefully and precisely recognize and evaluate authentic works of art, particularly those of Rothko.  It was that reputation that induced Eykyn Maclean, and therefore its clients, to trust Wick.

100.    Wick did not disclose to Eykyn Maclean that Knoedler was paying him a $300,000 "Consultant's fee" for his role in selling the Painting.

101.    After some negotiation, on or about April 7, 2008, Wick told Eykyn Maclean that the undisclosed sellers would accept no less than $7.2 million for the Painting, with an additional $150,000 to be paid to Wick as an "introductory commission."  Eykyn Maclean accepted the offer on Fertitta's behalf the next day.

102.    Wick instructed that the sale would be administered by defendant Urs O. Kraft, an attorney in Kilchberg, Switzerland.  On information and belief, Kraft sells artwork on behalf of his clients as part of his law practice.

103.    Kraft purportedly represented the "undisclosed seller."  Wick instructed that all payments be made to Wick, and Kraft confirmed that instruction.

104.    Plaintiffs arranged for the Painting to be purchased by the New York art dealer Gurr Johns (doing business as "Gurr Johns Masterson, Inc." or "Masterson Gurr Johns, Inc.") as an intermediary on Fertitta's behalf.  Gurr Johns, as noted above, has since assigned its claims to Fertitta.

105.    Kraft and Gurr Johns, acting on behalf of Fertitta, executed a Bill of Sale for the Painting on April 11, 2008, included herewith as Exhibit A.  It listed Gurr Johns as "Buyer" and "Urs O. Kraft, as agent for an undisclosed seller (the Owner)," as "Agent."

106.    Attached to the Bill of Sale as Exhibit A was a document describing the Painting and its provenance as follows:

Mark Rothko
*Unititled (Orange, Red and Blue)*
…
Provenance:   Private Collection, Switzerland (acquired from
              Artist through David Herbert, New York, either
              1959 or 1960)

              By descent from the above to the present owners

107.    The Bill of Sale included the following language:

        Agent [Kraft], on behalf of itself and on behalf of the
Owner, hereby represents and warrants to Buyer that: ... the Work
is authentic, that is, the Work was created by Mark Rothko and the
attribution, provenance and description of the Work as described in
this Bill of Sale are accurate and complete ...
        …
        Agent agrees to indemnify Buyer against all demands,
suits, judgments, damages, losses or other liability, including all
reasonable attorney or other professional fees, suffered or incurred
by, or asserted or alleged against Buyer arising by reason of or in
connection with the breach or alleged breach of or falsity or
inaccuracy of any of Agent's representations or warranties (express
or implied) or other terms set forth in this Bill of Sale.

108.    Pursuant to Wick's and Kraft's instructions, Gurr Johns paid on behalf of

Fertitta the purchase price of $7.2 million for the Painting, plus Wick's introductory commission

of $150,000, in four installments to three accounts with Swiss banks, each of which was in

Wick's name:  $3.6 million sent on April 21, 2008; $75,000 sent on or about April 22, 2008;

$3.6 million sent on May 30, 2008; and $75,000 sent on May 30, 2008.  The Painting was

shipped to Fertitta from New York on or about June 8, 2008.

109.    On information and belief, Wick sent Knoedler the proceeds from the sale

of the Painting by international wire in a series of transfers from late April through June 2008.

110.    Knoedler's records indicate that Knoedler was selling the Painting on

consignment for Rosales, who was to receive $4.55 million of the sales proceeds.  Knoedler paid

a small amount of the proceeds directly to Rosales and wired the remainder to bank accounts in Spain held in the name of Rosales and/or the Bergantiños Diaz brothers.

111.     In addition to whatever other fees Wick received, Knoedler paid Wick a $300,000 "Consultant's fee" for his role in selling the Painting to plaintiffs.

**Additional Attempts by Wick and Knoedler**
**to Sell Paintings from the Rosales Collection**

**To Third Parties**

112.     On information and belief, Wick attempted to arrange other sales on behalf of the Knoedler defendants from the Rosales Collection of forgeries.

113.     On information and belief, for instance, Wick arranged with Knoedler and Freedman to show another Rosales Collection painting at the Beyeler Foundation in June 2008. This painting was falsely attributed to the painter Barnett Newman.  Knoedler attempted to sell the purported Newman to Michael Hilti in the summer and fall of 2008 for $19 to $20 million.

**To Plaintiffs**

114.     On October 30, 2008, Wick sent Eykyn Maclean an email soliciting Fertitta's interest in another purported Rothko.  Wick wrote that it was "the perfect match" to the Painting and that "it seems as if they have been painted within a week."  Wick described the new painting as "[a]gain in excellent condition, from *another* private collection, same mount, simply perfect" (emphasis added), but he noted, "However, it is not quite ready yet."

115.     Wick attempted again to solicit Fertitta's interest in a purported Rothko in an email sent on March 11, 2009.  Wick described it as "mint condition, originally same source ... as if the two works had been conceived at the same moment."  He noted again, however, "[T]he work is not quite available yet."

116. On information and belief, Wick's October 2008 and March 2009 emails – neither of which led to purchases by Fertitta – concerned one or more additional forged Rothko paintings acquired from Rosales and the Bergantiños Diaz brothers and were sent in an attempt to continue transactions involving the Knoedler Defendants.

**Hammer's Knowledge and Involvement**

117. On information and belief, Hammer, both individually and on behalf of 8-31 and Knoedler, knew well before the sale of the Painting to plaintiffs that the Rosales Collection paintings were forgeries and that the Knoedler Defendants were involved in a fraudulent scheme. Hammer was intimately familiar with Knoedler's business and has testified in civil actions relating to the sale of forged paintings from the Rosales Collection that he was "directly responsible for the operations" of Knoedler.

118. Hammer was Freedman's sole supervisor and thus in a unique position to monitor and direct her work. Freedman informed Hammer of each sale of a Rosales Collection Painting and advised Hammer each time that she was "researching" the provenance of a "newly discovered" Rosales Collection painting. Hammer oversaw Freedman's compensation and periodically rewarded Freedman for her participation in the scheme by increasing her share of Knoedler's profits after she sold paintings from the Rosales Collection.

119. Hammer was familiar with Rosales, the Rosales Collection, and the shifting stories put forth to explain the provenance of the Rosales Collection paintings.

120. Hammer knew Knoedler bought the paintings from Rosales for inexplicably low prices and quickly resold them for enormous markups, the proceeds of which he channeled to himself through 8-31.

121.     Hammer carefully reviewed the October 2003 IFAR Report and was familiar with IFAR's conclusion that it could not confirm the attribution of the painting Rosales attributed to Pollock.

122.     On information and belief, Hammer, given his frequent communications with Freedman and his management of Knoedler's operations, was familiar with Dedalus's independent conclusions that several other Rosales Collection works were forgeries.

123.     Hammer regularly requested, received, and reviewed information about Knoedler's inventory of paintings.  He reviewed quarterly and annual financial statements, including summaries of cash on hand, profits, and recent transactions.

**Knoedler Is an Alter Ego of 8-31 and Hammer**

124.     At all relevant times, Knoedler was an alter ego of Hammer and 8-31. Through 8-31, Hammer exercised dominion and control over Knoedler and used it to participate in the RICO scheme alleged herein.

125.     Hammer was President of 8-31 and Chairman of Knoedler as well as another gallery called "Hammer Galleries."  8-31 had no employees who did not also hold positions for Knoedler or Hammer Galleries, or both.

126.     8-31 employees worked in a building that housed the Knoedler Gallery and bore only Knoedler's name on the awning.  8-31 had no offices separate from Knoedler's space.  8-31 paid no rent to Knoedler.  8-31 employees used Knoedler email addresses and shared a phone system with Knoedler.

127.     Knoedler had no board of directors and maintained no financial records separate and apart from 8-31's records.  Knoedler did not pay its own taxes, file its own tax returns, or pay its own employees directly.  These functions were performed through 8-31.

128.     While nominally maintaining separate bank accounts, Knoedler and Hammer Galleries indiscriminately shared funds at the direction of 8-31 executives and/or Hammer.  Knoedler and Hammer Galleries transferred funds directly to each other when one of them needed cash to operate.  The transfers occurred with no loan agreements and without the charge of interest.  They have not been repaid at any time relevant to the allegations herein.

129.     Funds transferred to 8-31 by one of its entities, such as Knoedler, were used indiscriminately to pay for expenses incurred by other entities, with no accounting to ensure that the appropriate entity was charged for its own expenses.  These expenses included taxes, business expenses, attorney and accountant fees, charitable contributions, consulting fees, and bank fees.  On information and belief, 8-31 has admitted that it paid these expenses directly from its account, with no effort to properly charge the expenses back to the LLC that incurred them.

130.     When 8-31 needed funds, it directed Knoedler or Hammer Galleries to transfer them to itself, looking to whichever gallery had immediately available funds, without regard to the galleries' receipt of consideration or the basis for 8-31's use of the funds.  8-31 called these transfers "interdivisional receivables."  These funds were commingled in a single 8-31 account and used to pay 8-31's expenses, including Hammer's annual salary (of approximately $400,000) and his "time and entertainment" expense reimbursements.

131.     From 2001 to 2012, 8-31 and Hammer transferred $23 million from Knoedler to 8-31 in the form of loans by Knoedler that were never repaid.

132.     On information and belief, because Knoedler's profitability was dependent on Rosales Collection sales, these transfers from Knoedler to 8-31 and Hammer largely represented the proceeds of unlawful sales of forged Rosales Collection paintings.

133.     On information and belief, 8-31 and Knoedler have admitted that in 2010, 8-31 "reclassified" the "interdivisional receivable" that 8-31 owed to Knoedler – at that time the largest asset on Knoedler's books – as a "dividend" to 8-31.  According to 8-31 and Knoedler, this "mean[t] that no repayment [was] necessary" – that is, Knoedler forgave the $23 million debt.

134.     This reclassification occurred in 2010, after a grand jury subpoena was issued to Knoedler in connection with its sale of paintings from the Rosales Collection, and shortly after a number of the paintings from the Rosales Collection were revealed to be forgeries. At this time 8-31 and the other Knoedler Defendants were aware that Knoedler was directly exposed to serious potential liability as a result of the Rosales Collection sales.

**The Profitability of the Scheme**

135.     The Rosales Collection scheme began as a relatively modest moneymaker. From 1994 through 1999, Knoedler sold approximately 16 paintings from the Rosales Collection for relatively modest sums, with a median price of about $235,000.

136.     After 1999, the prices Knoedler commanded for the Rosales Collection paintings skyrocketed.  On information and belief, between 2000 and 2008 Knoedler sold at least 16 paintings for a median price of about $2.6 million, a tenfold increase over the median sales price from the pre-2000 years.

137.     Each of the defendants profited greatly from their scheme.  Rosales and the Bergantiños Diaz brothers received approximately $15 million from Knoedler for the more than 30 paintings they sold to or through Knoedler.  They had bought the paintings from Qian for a few hundred or a few thousand dollars each.

138.    Knoedler resold the Rosales Collection paintings for a total of about $63.8 million, realizing gross profits of approximately $48.7 million, with markups in some cases as high as 16 times their purchase price.  This level of profit was far greater than Knoedler would have received if it had been selling authentic masterworks.

139.    Hammer, acting on behalf of Knoedler and 8-31, caused these millions of dollars in profit to be largely distributed to himself, through 8-31, and to Freedman.

140.    These Rosales Collection proceeds accounted for almost all of the profits that Knoedler garnered from 1994 to 2011 (excluding a one-time gain following the sale of the Knoedler building in February 2011).  From 1994 through 2011, Knoedler had a stated net total profit from all sources of tens of millions of dollars.  Without the Rosales Collection sales, on information and belief, during this period Knoedler instead would have recognized a net loss.

**The Investigation and the Closing of Knoedler**

141.    In 2009, the United States Attorney's Office for this District began to investigate defendants' activities and subpoenaed Freedman and Knoedler for documents concerning the Rosales Collection.  On information and belief, Hammer received and reviewed the subpoenas and was aware that Knoedler and Freedman were being investigated for unlawfully selling forged art.

142.    In October 2009, after learning of the federal criminal investigation, Hammer fired Freedman.  Hammer and Knoedler did not disclose to plaintiffs or, on information and belief, to any of Knoedler's other customers that he had fired Freedman or that Knoedler was being investigated for selling forged art.  Instead, he sent a letter to Knoedler's customers on October 27, 2009 announcing that Freedman had "resigned."

143.     In or about October 2009, Hammer had Knoedler's remaining inventory of unsold Rosales Collection paintings marked "not for sale."

144.     Deprived of its revenue stream from the sale of forged Rosales Collection paintings, Knoedler's profits disappeared.  According to Hammer, Knoedler incurred operating losses of $2.3 million in 2009 and $1.6 million in 2010, respectively.

145.     On November 29, 2011, a customer who had purchased a purported Pollock painting from Knoedler for approximately $15.3 million informed the gallery that his painting had been determined to be a forgery by a materials consulting firm that had performed a paint pigment analysis on the work.  The next day, Knoedler announced that it was shutting down permanently after more than 160 years of business.  Knoedler was not scheduled to close at that time; it had recently undergone renovations and was in the middle of an exhibition.

**Rosales's Guilty Plea**

146.     Rosales was arrested on or about May 21, 2013.  She was indicted in this District on July 17, 2013, and on August 14, 2013 the Government filed a superseding indictment describing the details of the scheme, including the acts of Rosales, Jose Carlos Bergantiños Diaz, and Qian (the latter two of whom were not identified by name).

147.     After the superseding indictment was filed, Freedman conceded that the works were forgeries.  *See* James Panero, "'I Am the Central Victim': Art Dealer Ann Freedman on Selling $63 Million in Fake Paintings," *New York*, Aug. 27, 2013, *available at* http://nymag.com/daily/intelligencer/2013/08/exclusive-interview-with-ann-freedman.html (Exhibit B).

148.     On September 16, 2013, Rosales pled guilty in this District to all nine counts of the superseding indictment, including wire fraud in violation of 18 U.S.C. §§ 2 and

1343, and conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. *United States v. Rosales*, No. 13-cr-518-KPF, Dkt. No. 23.

149. In her plea allocution (excerpted as Exhibit C), Rosales stated, "From in or around the 1990s through 2009, I sold various works of art to the Knoedler Gallery ....  All of the works I sold to [Knoedler], including works purported to be created by Mark Rothko, Jackson Pollock, and Robert Motherwell, were in fact, fakes created by an individual residing in Queens, New York."  Rosales further acknowledged participating in "a scheme to defraud the purchasers of the fake art" and "agree[ing] with others to sell" the works "and to make false representations as to the authenticity and provenance of the works."  She did not allocute that the Knoedler Defendants were unaware of the scheme.

150. At Rosales's plea allocution, the United States Attorney's Office for the Southern District of New York stated that it intended to make "additional arrests in this case."

**Resale of the Painting by Plaintiffs, Discovery of the Fraud, and Repurchase of the Painting**

151. On or about March 25, 2011, Fertitta sold the Painting to an unidentified buyer through the buyer's agents.  At the time, neither Fertitta nor those working with him in connection with the sale had any reason to doubt the Painting's authenticity.

152. On November 21, 2013, *The Art Newspaper* published an article identifying paintings from the Rosales Collection that had been sold by or through Knoedler. *See* Laura Gilbert, "More Victims of Abstract Expressionist Fakes Scandal Revealed," *The Art Newspaper* (Nov. 21, 2013), http://www.theartnewspaper.com/articles/More-victims-of-Abstract-Expressionist-fakes-scandal-revealed/31061 (attached hereto as Exhibit D).

153.    The article included a list of more than 30 paintings, along with their purchasers, purchase prices, dates of purchase, and the amounts that Knoedler paid Rosales and the Bergantiños Diaz brothers for them.  As to the Painting at issue in this case, it stated:

> Masterson Gurr Johns Inc. in Switzerland, bought a Rothko, *Untitled (Orange, Red and Blue)*, 1959, for $7.2m through the agent Urs Kraft on 30 April 2008.  Knoedler paid Rosales $4.6m for the work "owned jointly by she [sic] and her brother-in-law [on information and belief, Jesus Angel Bergantiños Diaz], although originally from same collection as the other pictures[.]"

154.    Plaintiffs eventually learned of this article and, upon further inquiry, understood the reference to the Rothko purchased by Gurr Johns to be the Painting they had purchased via Kraft and Wick.

155.    Before learning of the *Art Newspaper* article, plaintiffs had no notice that they had been victims of a fraud.  They did not know that the Painting emanated from the Rosales Collection or that Knoedler had been involved in its sale in any way.  At no point have any of defendants alerted plaintiffs that the Painting was a forgery.

156.    On February 21, 2014, plaintiffs (by counsel) provided notice to Kraft in accordance with the Bill of Sale challenging the "attribution, provenance and description of the [Painting]."  That notice requested *inter alia* that Kraft disclose the "identity and contact information of the Owner" as provided for in the Bill of Sale.  The notice was delivered to Kraft the next business day and he has acknowledged delivery, but as of the date hereof has not provided the required information or any substantive response to the notice.

157.    On information and belief, Kraft is aware who the "Owner" is, *i.e.* who it was beyond Wick (and potentially beyond defendants herein) that arranged for Kraft to sell the Painting to Plaintiffs and paid Kraft for selling the Painting and hiding their identities.  To date, despite repeated requests, Kraft has refused to identify the "Owner" to the Buyers in violation of

the Bill of Sale.  On information and belief, Kraft's refusal to disclose the identity of the

"Owner" is part of the pattern of fraud underlying the transaction complained of herein; through

his participation in the scheme to sell the fraudulent Painting and through his conduct in hiding

the identity(ies) of the Owner despite an affirmative obligation to disclose that information –

which began either around the time of sale or more recently – Kraft is believed to be a knowing

participant in defrauding plaintiffs.

158.    Because the Painting is a forgery, Fertitta has been exposed to potential

liability to the buyer for his sale of the Painting.  Fertitta has agreed to repurchase the Painting

from the buyer for $8.5 million (the buyer's costs associated with his acquisition of the Painting).

159.    Eykyn Maclean received fees for its services that it has now refunded,

thereby incurring damages.

**Indictment and Arrest of the Bergantiños Diaz Brothers**

160.    On March 31, 2014, a grand jury in this District indicted Jose Carlos

Bergantiños Diaz and Jesus Angel Bergantiños Diaz on four counts related to the scheme alleged

herein:  (1) conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349; (2) wire fraud in

violation of 18 U.S.C. §§ 2 and 1343; (3) conspiracy to commit money laundering in violation of

18 U.S.C. § 1956(h); and (4) money laundering in violation of 18 U.S.C. §§ 1956(a)(2)(B)(i).

*United States v. Bergantiños Diaz*, No. 14-cr-217-SHS, Dkt. No. 2.  Qian also was indicted.  The

District Court in this District unsealed the indictment on April 21, 2014.

161.    In addition, Jose Carlos Bergantiños Diaz was charged with conspiracy to

defraud the Internal Revenue Service in violation of 18 U.S.C. § 371; subscribing to false and

fraudulent tax returns in violation of 26 U.S.C. § 7206(1) and 18 U.S.C. § 2; and willful failure

to file reports of foreign bank and financial accounts in violation of 31 U.S.C. §§ 5314 and

5322(a) and 31 C.F.R. §§ 1010.350, 1010.306(c, d), and 1010.840(b).

      162.    On or about April 14, 2014, Jesus Angel Bergantiños Diaz was arrested in

Lugo, Spain.  On or about April 18, 2014, Jose Carlos Bergantiños Diaz was arrested in Seville,

Spain.  Both, on information and belief, are awaiting extradition proceedings in Spain.

**COUNT I**

**Rescission Based on Mutual Mistake**

**(Against Kraft)**

      163.    Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 162

as if fully set forth herein.

      164.    Plaintiffs bought the Painting believing it to be a genuine Rothko work.

      165.    Kraft maintained, represented and warranted in the Bill of Sale and in

communications by Wick that the painting was a genuine Rothko work.

      166.    The Painting has been identified as a forgery in the *Art Newspaper* on

November 21, 2013 as having been bought from the Rosales Collection.

      167.    The Work was not known beyond Knoedler, Wick, and their customers, so

there was no generally held belief as to its authenticity or lack thereof.

      168.    To the extent Kraft was not aware of the fraud, plaintiffs and Kraft were

mutually mistaken in believing that the Painting was an authentic work by Mark Rothko.

Plaintiffs never would have paid $7.35 million – and Kraft would never have accepted $7.2

million – for a painting that plaintiffs and Kraft did not believe to be an authentic Rothko.

      169.    Plaintiffs agreed to and did purchase the Painting without any knowledge

of these mistakes.

170.     Plaintiffs fully performed all of their obligations under the purchase agreement.

171.     Plaintiffs have no adequate remedy at law and are therefore entitled to rescind the purchase.

## COUNT II

### Rescission Based on Unilateral Mistake

### (Against Knoedler, Wick, and Kraft)

172.     Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 171 as if fully set forth herein, except that they plead Count II in the alternative to the allegations in Count I.

173.     At the time the Painting was purchased, Plaintiffs believed that:  (1) the Painting had been obtained from Rothko and passed to its current owner, a Swiss art collector, by descent; (2) there were no questions about the work's authenticity; and (3) the work was fully marketable.  These were mistaken beliefs.

174.     Plaintiffs purchased the Painting without any knowledge that the items delineated in Paragraph 173 were mistakes.

175.     Plaintiffs could not ascertain the truth concerning their mistaken belief at the time of the sale of the Painting because such information was exclusively in the defendants' possession.

176.     Kraft was either mutually mistaken with plaintiffs in selling the Painting, as alleged in Count I, or he, like Knoedler and Wick, was aware of information that indicated the Painting was not authentic and its provenance was false.

177.     Plaintiffs exercised reasonable diligence in investigating the Painting before purchasing it, *e.g.*, relying on Wick who is a world-class expert staking his reputation on

its authenticity, and by obtaining written guarantees of the truth of the defendants'
representations about the Painting.

178.     Plaintiffs fully performed all their obligations under the purchase
agreement.

179.     Plaintiffs have no adequate remedy at law and are therefore entitled to
rescind the purchase.

## COUNT III

### Breach of Express Warranties

**(Against Knoedler, Wick, and Kraft)**

180.     Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 179
as if fully set forth herein, except that they plead Count III in the alternative to the allegations in
Counts I and II.

181.     Before and at the time of the sale, for the purposes of inducing plaintiffs to
consummate the transaction and as the basis of the bargain, defendants represented to plaintiffs
that the Artist who created the Painting was Mark Rothko, that the Painting was "acquired from
Artist through David Herbert," and that it had passed "[b]y descent to the present owners."

182.     Wick stated in an April 7, 2008 email, "I confirm that this work has been
submitted to the team, all is perfectly fine, otherwise I would not want to be involved with it.
For this I stand with my name as a Rothko scholar."

183.     The Bill of Sale executed on April 11, 2008 by Kraft, on behalf of seller,
and Gurr Johns, on behalf of Fertitta, (Exhibit A) stated that the Painting was by Mark Rothko
and described its provenance as follows:  "Private Collection, Switzerland (acquired from Artist
through David Herbert, either 1959 or 1960)[;] By descent from the above to the present
owners."

184.     The Bill of Sale also included language stating, "Agent [Kraft], on behalf of itself and on behalf of the Owner, hereby represents and warrants to Buyer that: ... the Work is authentic, that is, the Work was created by Mark Rothko and the attribution, provenance and description of the Work as described in this Bill of Sale are accurate and complete ...."

185.     The language quoted in Paragraphs 182 through 184 creates express warranties under N.Y. U.C.C. § 2-313(1).

186.     In agreeing to consummate the transaction, plaintiffs relied on Knoedler's, Wick's, and Kraft's express warranties concerning the Painting's authenticity and provenance and would not have purchased the work had they been aware that those warranties were false.

187.     Plaintiffs fully performed their obligations under the purchase agreement.

188.     Defendants breached their warranties because (a) the Painting is a forgery, and (b) the provenance of the work, as stated by at least Wick and Kraft, as at least designated by Knoedler, and as stated in the Bill of Sale executed by Kraft, is false.

189.     Plaintiffs suffered damages of more than $8.6 million, plus interest, as a result of this breach.

## COUNT IV

## Breach of Implied Warranty of Merchantability

### (Against Knoedler, Wick, and Kraft)

190.     Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 189 as if fully set forth herein, except that they plead Count IV in the alternative to the allegations in Counts I and II.

191.     Knoedler was a merchant with respect to goods of the kind that it sold to plaintiffs (namely, works of fine art), and held itself out as having knowledge and skill particular to art, including modern American art such as the Painting.

192.     Wick was a well-respected, world-renowned scholar with respect to goods of the kind that he sold to plaintiffs (namely, works of fine art), and held himself out as having knowledge and skill particular to art, including modern American art such as the Painting.  Wick vouched for the authenticity of the Painting based upon, in his words, his "name as a Rothko scholar."

193.     In selling the Painting, Knoedler, Wick, and Kraft each made an implied warranty under N.Y. U.C.C. § 2-314 that the Painting was merchantable.

194.     Knoedler, Wick, and Kraft breached this implied warranty of merchantability because the Work cannot pass without objection in the trade as an authentic Rothko, and the warranted provenance – "Private Collection, Switzerland (acquired from Artist through David Herbert, New York, either 1959 or 1960)[;] By descent to the present owners" – cannot be substantiated.

195.     Plaintiffs notified defendants by letter to Kraft of their breach of the implied warranty of merchantability within a reasonable time after discovering the breach.

196.     Plaintiffs suffered damages of more than $8.6 million, plus interest, as a result of this breach.

## COUNT V

### Breach of Contract

**(Against Kraft)**

197.     Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 196 as if fully set forth herein.

198.     Kraft sold the Painting, as stated in the Bill of Sale, "as agent for an undisclosed seller (the Owner)."

199.    The Bill of Sale states, "If the Buyer at any time alleges in good faith a breach of any representation or warranty contained in this Bill of Sale and provides Agent with written notice of such alleged breach and the basis therefore, then Agent or Agent's Counsel shall furnish Buyer with the identity and contact information of the Owner."

200.    By letter dated February 21, 2014 (Kraft acknowledged receipt of the letter), counsel for Buyer alleged in good faith a breach of "representation or warranty contained in th[e] Bill of Sale" concerning the provenance of the Painting.  That letter not only provided Kraft with written notice of the breach but provided the basis therefore.  As a result, Kraft as "Agent" was required to furnish "the identity and contact information of the Owner" either directly or through counsel.  As of the date hereof, even after having been served with the initial Complaint, Kraft continues to hide the identity of the "Owner," refusing to disclose the identity and contact information of the "Owner" as required by the Bill of Sale.

201.    Kraft's refusal to disclose the identity and contact information of the "Owner" as required by the Bill of Sale is a continuing breach of Kraft's obligations under the Bill of Sale.

202.    As a result of Kraft's refusal to disclose the identity and contact information of the "Owner" as required by the Bill of Sale, on information and belief Kraft is hiding the identity of at least one John Doe defendant and the assets from which plaintiffs can obtain compensation.  As a result at least of this continuing breach of Kraft's obligations under the Bill of Sale, Kraft is liable for damages to plaintiffs in the amount of at least $8.6 million.

## COUNT VI

### Indemnification/Reimbursement of Expenses

**(Against Knoedler, Rosales, Jose Carlos Bergantiños Diaz,
Jesus Angel Bergantiños Diaz, Wick, and Kraft)**

203.    Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 202 as if fully set forth herein.

204.    The Bill of Sale is a valid and enforceable contract that gives rise to certain obligations on the part of defendants.

205.    In selling the Painting, Kraft acted on behalf of one or more unnamed sellers.  On information and belief, the unnamed sellers are among the other defendants.

206.    Under the Bill of Sale, Kraft and the Painting's Owner agreed to "indemnify Buyer against all demands, ... damages, losses or other liability, including all reasonable attorney or other professional fees, suffered or incurred by, or asserted or alleged against Buyer arising by reason of or in connection with the breach or alleged breach of or falsity or inaccuracy of any of Agent's representations or warranties (express or implied) or other terms set forth in [the] Bill of Sale."

207.    As a result of defendants' aforementioned breaches of representations and warranties set forth in the Bill of Sale, Plaintiffs have incurred unreimbursed charges, fees, costs, and expense, including reasonable attorneys' fees and expenses in connection with the enforcement and preservation of their rights and the prosecution of this action.

208.    Plaintiffs are entitled to indemnification and reimbursement from defendants for those charges, fees, costs, and expenses in an amount to be determined at trial.

## COUNT VII

## Fraud

**(Against Knoedler, Freedman, Hammer, Andrade, 8-31, Rosales, Jose Carlos Bergantiños Diaz, Jesus Angel Bergantiños Diaz, Wick, Kraft and John Does 1-10)**

209.    Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 208 as if fully set forth herein, except that they plead Count VII in the alternative to the allegations in Counts I and II.

210.    Knoedler and Freedman, through other defendants, fraudulently induced plaintiffs to purchase the Painting by causing Wick to tell plaintiffs that the Painting was an authentic Rothko painting that passed "by descent" to its owner.  Defendants created this false provenance with the intent of using it to market the Painting.

211.    Defendants knew the Painting was a forgery, that its provenance was a fiction, and that it had no value.

212.    Wick fraudulently induced plaintiffs to purchase the Painting by communicating to them the false provenance that defendants concocted; by falsely stating that the Painting was being considered for inclusion in the National Gallery of Art's *catalogue raisonne* of Rothko paintings; by falsely stating that the work had been "submitted to the team" and that "all [was] perfectly fine"; and by falsely indicating that the Painting had been authenticated by Christopher Rothko, Mark Rothko's son.

213.    Wick had reason to know that each of these statements was false, that the Painting was a forgery with no value, and that its provenance was a fiction.  Wick made the representations in Paragraphs 94, 182, 183, 184, and 194 either intentionally or with willful blindness or reckless disregard for the truth.

214.    Plaintiffs relied on the Painting's false provenance and on each of the

misrepresentations made by Wick in purchasing the work.

215.   Plaintiffs' reliance on the Painting's false provenance and Wick's misrepresentations was reasonable because of Wick's stature in the artistic community, his affiliation with the prestigious Beyeler Foundation, his renown as a curator and scholar of the work of Rothko and other Abstract Expressionists, and his affirmation, "For this I stand on my work as a Rothko scholar."

216.   Plaintiffs' reliance on the Painting's false provenance and on Wick's misrepresentations was reasonable because the Bill of Sale included language "represent[ing] and warrant[ing] to Buyer that ... the Work is authentic, that is, the Work was created by Mark Rothko and the attribution, provenance and description of the Work as described in the Bill of Sale are accurate and complete."

217.   In reliance on the misrepresentations and omissions of Knoedler, Freedman, and Wick, plaintiffs were damaged in the amount of more than $8.6 million, plus interest.

218.   At least by hiding the identity of the "Owner," Kraft is a participant in the fraud, shielding assets otherwise available to compensate Plaintiffs for the losses caused by the fraud.

219.   Because defendants engaged in the fraudulent conduct stated in this Complaint willfully and maliciously, and with the intent to damage plaintiffs, plaintiffs are entitled to an award of punitive damages.

220.   On information and belief, John Does 1–10 participated in the fraud.

## COUNT VIII

## Fraudulent Concealment

**(Against Knoedler, Freedman, Hammer, Andrade, 8-31, Rosales, Jose Carlos Bergantiños Diaz, Jesus Angel Bergantiños Diaz, Wick, Kraft, and John Does 1-10)**

221.    Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 220 as if fully set forth herein, except that they plead Count VIII in the alternative to the allegations in Counts I and II.

222.    Defendants fraudulently concealed from plaintiffs facts that were not readily available to plaintiffs about which the defendants had superior knowledge.  The defendants understood that plaintiffs would purchase the Painting on the basis of the incomplete and incorrect knowledge the defendants passed on to them given *inter alia,* Wick's prominence in the field.

223.    If plaintiffs had known the facts that defendants had concealed from them, they would not have bought the Painting.

224.    Defendants did not disclose, *inter alia*, that:

a.    Knoedler had obtained the Painting from Rosales, Jose Carlos Bergantiños Diaz, and Jesus Angel Bergantiños Diaz, who had sold Knoedler a seemingly limitless cache of more than 30 purportedly undiscovered paintings since 1994, which Knoedler immediately resold for huge markups.

b.    Knoedler and Freedman had never dealt with the purported owner of other Rosales Collection paintings and knew of their purported provenance only through the representations of Rosales and the Bergantiños Diaz brothers.

c.    Knoedler developed the Herbert story relating to the Rosales Collection

Paintings only after IFAR rejected as "inconceivable" the previous

provenance, which centered on Alfonso Ossorio.

d.   Rosales had refused to ask Mr. X, Jr. to sign a revised Authentication

Statement verifying the authenticity of the Rosales Collection paintings.

These concealed facts were material because they were warning signs that the Painting was a

forgery and had no value.

225.   In addition to the above, Wick did not disclose, *inter alia*, that:

a.   Wick had conducted no independent research into the Painting's

authenticity or provenance despite vouching for the work based on his

"name as a Rothko scholar."

b.   Wick had never researched the purported Herbert link to the provenance

of the Painting, and the passage concerning Herbert that he included in his

Rothko Rooms article had been lifted wholesale from an internal Knoedler

memorandum.

c.   Wick had conducted no independent research into the authenticity or

provenance of the Rosales Collection works that he had arranged with

Knoedler to show at the Beyeler Foundation.

d.   Knoedler had agreed to pay Wick $300,000 to compensate him for his role

in selling the Painting, in addition to the $150,000 that he was charging

plaintiffs.

These facts were material because they indicated that Wick had no basis to "stand on [his] work

as a Rothko scholar" in vouching that "everything [was] perfectly fine" with the Painting and

that Wick was acting as an agent for the seller, not as a neutral broker.

226.    Kraft has failed to disclose the identity and contact information for the "Owner."

227.    As a result of defendants' failure to provide plaintiffs with the full information that was available to defendants, plaintiffs—as defendants intended—purchased the Painting and suffered damages in an amount greater than $8.6 million as a result of having purchased a forgery.

228.    Because defendants engaged in the fraudulent conduct stated in this Complaint willfully and maliciously, and with the intent to damage plaintiffs, plaintiffs are entitled to an award of punitive damages.

229.    On information and belief, John Does 1–10 participated in the fraud.

## COUNT IX

### Aiding and Abetting Fraud

**(Against Knoedler, Freedman, Hammer, Andrade, 8-31, Rosales, Jose Carlos Bergantiños Diaz, Jesus Angel Bergantiños Diaz, Wick, Kraft, and John Does 1-10)**

230.    Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 229 as if fully set forth herein, except that they plead Count IX in the alternative to the allegations in Counts I and II.

231.    Defendants perpetrated a fraud on plaintiffs as set forth herein.

232.    Rosales, Jose Carlos Bergantiños Diaz , and Jesus Angel Bergantiños Diaz had knowledge of the fraud because they bought the works from a forger, took steps to "age" them, and sold them to Freedman for fraudulent resale to customers.

233.    Rosales, Jose Carlos Bergantiños Diaz, and Jesus Angel Bergantiños Diaz provided substantial assistance by providing the forged works to Freedman and introducing them into the market.

234.     Freedman had knowledge of the fraud because, *inter alia*, she (a) continuously bought the Rosales Collection paintings in circumstances strongly indicating fraud, (b) developed stories of the paintings' provenances with no factual or documentary evidence, and (c) learned of the conclusions of neutral experts that the Rosales Collection paintings were inauthentic and their purported provenances false.

235.     Freedman provided substantial assistance, on information and belief, by arranging for Wick and Kraft to sell the Painting to plaintiffs.

236.     Wick had actual knowledge of the fraud or, at a minimum, consciously and recklessly avoided knowledge of the fraud, because he (a) expressly vouched for the authenticity of the Painting based on his position as a Rothko scholar despite knowing that he had no basis to do so; (b) repeatedly arranged for Rosales Collection works to be shown at the Beyeler Foundation without conducting sufficient diligence into their provenance; and (c) passed off Knoedler's false Herbert provenance story as his own work in his Rothko Rooms article without performing any independent research into its veracity.

237.     Wick provided substantial assistance by communicating the Painting's false provenance to plaintiffs, negotiating the sale and purchase price of the work, collecting payment of the proceeds of the sale, and facilitating the payment of the purchase price to Knoedler.

238.     Hammer knew of the fraud through, *inter alia*, (a) the IFAR report, which he carefully reviewed in 2003 and which raised serious questions about the provenance and authenticity of all of the Rosales Collection works; (b) Dedalus's conclusions that seven Rosales Collection works were fakes and that the Herbert story could not be credited; (c) the documents demonstrating Knoedler's failed efforts to verify the Rosales Collection; (d) the outsized profits

Knoedler made on the sales of works from the Rosales Collection, which were highly unusual for this industry and which, at that time, Hammer knew accounted for nearly all of Knoedler's profits during the course of the scheme; and/or (e) Hammer's direct communications with Freedman, which included reports of every sale of a Rosales Collection work and discussions of the source of those works and Knoedler's "research" regarding their provenance.

239.    Hammer provided substantial assistance to the ongoing Rosales Collection frauds by (a) allowing Freedman to use the Knoedler name and platform to lure victims; (b) personally approving increases in Freedman's profit sharing in 2002 and 2008, thereby rewarding Freedman's conduct of the fraud, (c) assisting Freedman in obtaining Mirvish's investment in a Rosales Collection work that had been returned by Knoedler's client after the IFAR Report questioned its authenticity, and (d) directing the concealment of the fraud, despite his unique position to disclose it and end it.

240.    Andrade had knowledge of the fraud because he served as Knoedler and Freedman's "gateway" to Rosales and the Bergantiños Diaz brothers, participated in developing the false Herbert story of the paintings' provenance, and participated in meetings relating to the fraud.

241.    Andrade provided substantial assistance by introducing Freedman to Rosales and by helping Knoedler develop the false provenance based on his friend Herbert.

242.    Kraft provided substantial assistance by serving as Agent for the 2008 sale and by continuing to hide the identity and contact information of the "Owner," in violation of the Bill of Sale.

243.    The actions of defendants in assisting and concealing the fraud are the proximate cause of plaintiffs' damages.

244.     As a result of the fraud, plaintiffs suffered damages in an amount no less than $8.6 million.

245.     Because defendants engaged in the fraudulent conduct stated in this Complaint willfully and maliciously, and with the intent to damage plaintiffs, plaintiffs are entitled to an award of punitive damages.

246.     On information and belief, John Does 1 through 10 participated in and aided and abetted the fraud.

## COUNT X

### Conspiracy to Commit Fraud

**(Against Knoedler, Freedman, Hammer, Andrade, 8-31, Rosales, Jose Carlos Bergantiños Diaz, Jesus Angel Bergantiños Diaz, Wick, and John Does 1-10)**

247.     Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 246 as if fully set forth herein, except that they plead Count X in the alternative to the allegations in Counts I and II.

248.     Defendants perpetrated a fraud on plaintiffs as set forth herein.

249.     Defendants maintained a corrupt agreement and enterprise in which they knowingly misrepresented the provenance of paintings for the purpose of selling the forged works as authentic.

250.     Defendants participated in multiple meetings to discuss and alter the story regarding the provenance of the Rosales Collection works, giving rise to the inference of a conscious, corrupt agreement.

251.     Defendants had actual or constructive knowledge of the fraud, as set forth above.

252.     Freedman and Knoedler committed overt acts in furtherance of the conspiracy by, *inter alia*, selling the Rosales Collection works to customers and communicating to them misrepresentations concerning the provenance of each work.

253.     Hammer committed overt acts in furtherance of the conspiracy by (a) allowing Freedman to use the Knoedler name and platform to lure victims; (b) rewarding Freedman for her perpetration of the fraud; (c) assisting Freedman in obtaining Mirvish's investment in a Rosales Collection work that had been returned by Jack Levy after the IFAR Report questioned its authenticity; and (d) directing the concealment of the fraud, both during the scheme and after at its conclusion.

254.     Andrade committed overt acts in furtherance of the conspiracy by, *inter alia*, introducing Knoedler and Freedman to Rosales and by communicating with Knoedler and Freedman concerning the story of Herbert as intermediary.

255.     Wick committed overt acts in furtherance of the conspiracy by marketing the Painting to plaintiffs, negotiating its price, securing payment for the Painting, and soliciting Fertitta's interest in a second forged Rothko work.

256.     Jose Carlos Bergantiños Diaz committed overt acts in furtherance of the conspiracy by, *inter alia*, acquiring forged works from Qian, forging the artists' signatures, "aging" the paintings to make them appear authentic, and distributing the proceeds of the scheme.

257.     Jesus Angel Bergantiños Diaz committed overt acts in furtherance of the conspiracy by acquiring the forged works from Qian, developing the story of Mr. X, and distributing the proceeds of the fraudulent scheme to overseas bank accounts.

258.    Rosales committed overt acts in furtherance of the conspiracy by selling the works to Knoedler.

259.    8-31 Holdings committed overt acts in furtherance of the conspiracy by rewarding Freedman for the fraud and by participating, through its agents Hammer and Freedman, in the concealment of the fraud.

260.    Kraft provided substantial assistance by serving as Agent for the 2008 sale and by continuing to hide the identity and contact information of the "Owner," in violation of the Bill of Sale.

261.    In reliance on Defendants' misrepresentations and omissions, plaintiffs were damaged in the amount of more than $8.6 million, plus interest.

262.    Because the defendants engaged in the conspiracy to commit fraud stated in this Amended Complaint willfully and maliciously, and with the intent to damage plaintiffs, plaintiffs are entitled to an award of punitive damages.

263.    On information and belief, John Does 1 through 10 joined the conspiracy and committed overt acts in furtherance of it.

### COUNT XI

### Racketeering in Violation of 18 U.S.C. § 1962(c)

**(Against Knoedler, Freedman, Hammer, Andrade, 8-31, Rosales, Jose Carlos Bergantiños Diaz, Jesus Angel Bergantiños Diaz, Wick, and John Does 1-10)**

264.    Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 263 as if fully set forth herein, except that they plead Count XI in the alternative to the allegations in Counts I and II.

265.    The association of defendants and other individuals constituted an enterprise within the meaning of 18 U.S.C. § 1961(c), which enterprise was engaged in, and

whose activities affected, interstate and foreign commerce.  This enterprise was continuous in that it lasted for more than two years, had an ascertainable structure, and acted in ways distinct from the predicate offenses alleged by plaintiffs.  This enterprise was continuous for the additional reason that the predicate acts were a regular way of conducting Knoedler's ongoing business and of conducting or participating in the ongoing RICO enterprise.

266.     Each defendant is a person within the meaning of 18 U.S.C. § 1961(3) and separate from the enterprise.

267.     Defendants' scienter is established by the pattern of intentional and knowing fraudulent, material misrepresentations and omissions described above.

### Wire and Mail Fraud (Violations of 18 U.S.C. §§ 1341, 1343)

268.     Defendants and other members of the enterprise, having devised a scheme or artifice to defraud, and/or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of mail and wire communication in interstate or foreign commerce writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice (namely, to sell forged paintings).  These included the following communications:

a.     On information and belief, Knoedler and Freedman used international wires in early 2008 to notify Wick that Knoedler was selling the Painting.

b.     On April 7, 2008, Wick sent Eykyn Maclean an email using international wires repeating the false provenance for the Painting and making a series of other misrepresentations.

c.   Wick used international wires in April and May 2008 to negotiate the price of the Painting, to transmit and execute the Bill of Sale for the work (which included the Painting's false provenance), and to arrange for payments to the work to be made by international wire to various bank accounts in Switzerland.

d.   Plaintiffs paid for the Painting in a series of international wire transfers, including wires to three bank accounts in Switzerland on or about April 21, 2008, April 22, 2008, and May 30, 2008.

e.   On or about May 1, 2008 and June 13, 2008, Knoedler used international wires to send a portion of the proceeds from the sale of the Painting to an account held by Jose Carlos Bergantiños Diaz at a bank in Madrid, Spain.

f.   On information and belief, Knoedler and Freedman used international wires in or around October 2008 to notify Wick that Knoedler was selling a second purported Rothko that was, on information and belief, a forgery from the Rosales Collection.

g.   On or about October 30, 2008, Wick used international wires to solicit plaintiffs' interest in the second purported Rothko painting that was, on information and belief, a forgery from the Rosales Collection.

h.   In November 2007, Knoedler and Freedman used interstate wires to receive payment for a forged Pollock painting that Knoedler sold to Pierre LaGrange.

i.  In June 2007, Knoedler and Freedman used interstate wires to market and to receive payment for a forged Willem de Kooning painting from the Rosales Collection that Knoedler sold to John Howard.

j.  In November 2005, Knoedler and Freedman used interstate mails and/or wires to send an invoice and receive payment for a forged Clyfford Still painting from the Rosales Collection that Knoedler sold to Nicholas and Eugenia Taubman.

k.  On information and belief, Knoedler and Freedman used international wires and/or mails to transmit to Wick the "Notes on a Collector" article memorandum discussing Herbert, which Wick copied wholesale for his 2005 Rothko Rooms article.

l.  In November and December 2004, Knoedler and Freedman used interstate mails and/or wires to market, negotiate the price of, and receive payment for a forged Rothko painting from the Rosales Collection that Knoedler sold to Domenico and Eleanore de Sole.

m.  On information and belief, Andrade used interstate and/or international mails and/or wires in or around fall 2004 to assist Knoedler and Freedman in devising the story of Herbert as intermediary.

n.  In November 2002, Knoedler used international wires to receive payment for a forged Rothko work from the Rosales Collection that Knoedler sold to Michael Hilti on behalf of the Martin Hilti Family Trust.

o.  On information and belief, Wick, Knoedler, and Freedman used international wires and/or mails in 2002 to arrange for the showing of a forged Rothko work at the Rothko Rooms exhibit at the Beyeler Foundation.

p.  On information and belief, Knoedler and Freedman used interstate wires and/or mails in December 2001 to market, transmit an invoice for, and collect payment for the forged Pollock from the Rosales Collection that Knoedler sold to Jack Levy.

q.  On information and belief, Rosales, Jose Carlos Bergantiños Diaz, and Jesus Angel Bergantiños Diaz used international wires on numerous occasions from 1998 through 2011 to transfer the proceeds of the scheme to bank accounts in Spain that they controlled and to arrange the further distribution of the proceeds of the scheme to other bank accounts they controlled.

r.  On information and belief, defendants used interstate and international mails and/or wires to market, negotiate the sales of, transmit invoices for, and receive payment for all or substantially all of the other Rosales Collection works that Knoedler sold between 1994 and 2008.

s.  On information and belief, Andrade used interstate and/or international mails and/or wires in or around 1994 to introduce Knoedler and Freedman to Rosales.

t.   On information and belief, John Does 1 through 10 used interstate and/or international mails and/or wires in furtherance of the conspiracy.

269.   Each participant knew, expected, reasonably foresaw, and intended that these communications by mails and wires in interstate and foreign commerce would be used in furtherance of the racketeering scheme and that such use was an essential part of the scheme.

270.   Rosales pleaded guilty to wire fraud and conspiracy to commit wire fraud in connection with the sale of fraudulent artwork from the Rosales Collection, including the Painting at issue.

271.   Defendants willfully and with intent to defraud sold forged artworks to plaintiffs and, on information and belief, dozens of other victims and also misrepresented and/or concealed the material facts from them, as discussed above.

272.   Plaintiffs and other victims relied upon defendants' misrepresentations, and such reliance was reasonable, as discussed above.

273.   Plaintiffs and other victims were injured by defendants' fraudulent conduct, as discussed above.

**Pattern of Racketeering Activity**

274.   The aforesaid acts had the same or similar purposes, results, participants, victims, and/or methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events.  Defendants engaged in a pattern of racketeering activity from at least 1994 and continuing at least through March 2009, if

not longer, to obtain and resell counterfeit paintings purportedly by Abstract Expressionist artists.  That pattern included multiple predicate acts of mail and wire fraud.

275.    The racketeering acts identified above (a) were in furtherance of a common goal, including the goal of profiting illegally by fraudulently inducing individuals to buy counterfeit works of art; (b) used similar methods to perpetrate the frauds, including the use of similar misrepresentations regarding the provenance of the counterfeit works; (c) had similar participants; and (d) had similar victims.

276.    The acts of racketeering activity discussed above extended over a substantial period of time beginning around 1994 and continued until at least March 2009. These acts were a regular way of conducting defendants' ongoing business and of conducting or participating in the ongoing RICO enterprise. They were a critical means of supporting defendants' business and were sufficiently continuous to form a pattern of racketeering activity.

277.    Defendants participated in the scheme through themselves and, in the case of Knoedler, its representatives, employees, agents, officers, and John Does 1 – 10 (that is, others whose identities are known only to defendants at this time) as well as at least some of the other defendants themselves.  Defendants benefitted enormously from the profits they made from the scheme.

278.    Each defendant's participation was critical to the racketeering scheme. They enabled, conducted, maintained, aided, abetted, and profited from the racketeering scheme as detailed above.

279.    The precise role each defendant played, including the John Doe defendants, is known only to defendants at this time.  Such information, and evidence

concerning their participation, is exclusively within the possession and knowledge of defendants.

280.    Plaintiffs have been injured in their business or property by reason of defendants' violations of 18 U.S.C. § 1962(c).  As a direct and proximate result of these violations, plaintiffs have lost millions of dollars in connection with a purportedly authentic work of art that turned out to be worthless.

281.    By reason of this violation of 18 U.S.C. § 1962(c), plaintiffs are entitled to recover from defendants treble damages, pre- and post-judgment interest, costs, and attorneys' fees.

## COUNT XII

### Violation of 18 U.S.C. § 1962(d)

**(Against Knoedler, Freedman, Hammer, Andrade, 8-31, Rosales, Jose Carlos Bergantiños Diaz, Jesus Angel Bergantiños Diaz, Wick, and John Does 1-10)**

282.    Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through **Error! Reference source not found.** as if fully set forth herein, except that they plead Count XII in the alternative to the allegations in Counts I and II.

283.    In violation of 18 U.S.C. § 1962(d), defendants and others whose identities are known only to defendants at this time conspired to violate the provisions of 18 U.S.C. § 1962(c) in that, beginning no later than 1994 and continuing through at least March 2009, they knowingly agreed and conspired together and with others to conduct or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity described above.  The sophisticated frauds that were perpetrated and the continuance of this scheme could not have occurred without the consent and knowing connivance of the defendants and other conspirators.

284.    As part of and in furtherance of their conspiracy, Knoedler, Freedman, Hammer, 8-31, Andrade, Rosales, Jose Carlos Bergantiños Diaz, Jesus Angel Bergantiños Diaz, and Wick, and, on information and belief, John Does 1–10, agreed to and conspired in the commission of the many predicate acts described above, with the knowledge that they were in furtherance of that pattern of racketeering activity.  As part of and in furtherance of their conspiracy, each of these defendants agreed to and did commit at least two predicate acts of racketeering.  Further, each defendant's actions are attributable to the other defendants.

285.    None of defendants have withdrawn, or otherwise dissociated themselves, from the conspiracy at issue or the other conspirators.

286.    As a direct and proximate result of each defendant's violations, plaintiffs have been injured as aforesaid in business or property by reason of defendants' violations of 18 U.S.C. § 1962(d).

287.    By reason of defendants' violations of 18 U.S.C. § 1962(d), plaintiffs are entitled to treble damages, pre- and post-judgment interest, costs, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court enter a judgment awarding plaintiffs:

A.   Compensatory damages in an amount to be determined at trial, but not less than $8.6 million, plus interest.

B.   Punitive damages in an amount to be determined at trial on plaintiffs' Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Causes of Action as a result of defendants' willful and intentional tortious misconduct;

C.   Treble damages under 18 U.S.C. § 1962(c) and (d) on plaintiffs' Ninth and Tenth Causes of Action;

D.  In the alternative to the above, rescission of the Bill of Sale;

E.  Costs, expenses, disbursements, and reasonable attorneys' fees in an amount

to be awarded at trial; and

F.  Such other relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiffs hereby request a trial by jury on all claims so triable.

Dated:  May 13, 2014                           Respectfully submitted,
        New York, New York

                                                */s/ Jeffrey I. D. Lewis*
                                                Jeffrey I. D. Lewis (jidlewis@pbwt.com)
                                                John P. Figura (jfigura@pbwt.com)
                                                PATTERSON BELKNAP WEBB & TYLER LLP
                                                1133 Avenue of the Americas
                                                New York, New York 10036
                                                Telephone:  (212) 336-2000
                                                Fax:  (212) 336-2222

                                                *Attorneys for Plaintiffs*