UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                    :
FRANK J. FERTITTA III and EYKYN          :
MACLEAN, LP,                                      :
                                    Plaintiffs,     :          14-CV-2259 (JPO)
                                                    :
                    -v-                             :          OPINION AND ORDER
                                                    :
KNOEDLER GALLERY, LLC d/b/a           :
KNOEDLER & COMPANY; 8-31 HOLDINGS, :
INC.; MICHAEL HAMMER; ANN              :
FREEDMAN; JAIME ANDRADE; GLAFIRA    :
ROSALES; JOSÉ CARLOS BERGANTIÑOS   :
DIAZ; JESUS ANGEL BERGANTIÑOS DIAZ; :
OLIVER WICK; URS KRAFT; and JOHN DOES:
# 1 to 10,                                         :
                                   Defendants. :
                                                   X
------------------------------------------------------------

J. PAUL OETKEN, District Judge:

     Plaintiffs Frank J. Fertitta III and Eykyn Maclean, LP ("Eykyn") bring this action against

Knoedler Gallery, LLC ("Knoedler"); 8-31 Holdings, Inc. ("8-31"); Michael Hammer; Ann

Freedman; Jaime Andrade; Glafira Rosales; José Carlos Bergantiños Diaz ("José Diaz"); Jesus

Angel Bergantiños Diaz ("Jesus Diaz"); Oliver Wick; Urs Kraft; and ten unidentified

individuals.  Plaintiffs allege causes of action arising under the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1962, *et seq.*, several tort claims, and claims for

rescission and breach of warranty.[1]  Andrade and Kraft have moved to dismiss the action in its

---

[1] Plaintiffs allege that this Court has both diversity jurisdiction under 28 U.S.C. § 1332 and
federal question jurisdiction under 28 U.S.C. § 1331.  (Dkt. No. 15, Amended Complaint ¶¶ 26-
27.)  (All citations are to the Amended Complaint unless specified otherwise.)  Plaintiffs'
allegations, however, are inadequate to plead complete diversity as required under § 1332(a)(1);
indeed, the allegations suggest that complete diversity is lacking.  Eykyn is alleged to be a
limited partnership organized under the laws of the State of New York.  The citizenship of an
LP's partners controls for diversity purposes.  *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187
(1990).  The complaint does not allege the citizenship of the partners of Eykyn (although it does

entirety under Federal Rule of Civil Procedure 12(b)(6), and Wick has moved to dismiss part of the complaint under Rule 12(b)(6).  Plaintiffs have moved for leave to amend the Amended Complaint in the event that the Court finds their allegations against Andrade to be insufficient. For the reasons that follow, Andrade's and Wick's motions to dismiss are denied in their entirety; Kraft's motion is granted in part; and Plaintiffs' motion to amend is denied as moot.

## I.    Background[2]

In 2008, Fertitta bought a painting for $7.2 million.  He thought it was painted by Mark Rothko in 1959, purchased by "Mr. X," an anonymous Swiss art collector, shortly thereafter (¶ 89), and bequeathed to his son, "Mr. X, Jr."  (¶ 85.)  Fertitta thought he was buying the painting from Mr. X Jr., who, in order to remain anonymous, did business through Kraft, an attorney in Switzerland.  Wick, a world-renowned Rothko expert, advised Fertitta on the provenance of the painting, confirming that "all is perfectly fine."  (¶ 94.)  For this Wick "st[ood] with [his] name as a Rothko scholar."  (*Id.*)  That turned out to be a mistake.  The painting was actually painted by Pei-Shen Qian, a Chinese-born artist living in Queens, and sold by Rosales, a gallerist in Long Island who dealt—until her recent criminal conviction—almost exclusively in specious artworks.  (¶ 29.)  And there is no Mr. X.

The purported 1959 Rothko sold to Fertitta—*Untitled (Orange, Red, and Blue)*—was one of many forged paintings sold by the now-defunct Knoedler Gallery in New York.  The

---

allege that Eykyn's principal place of business is in New York City—an irrelevant fact, given that Eykyn is an LP).  But two of the individual Defendants—Freedman and Andrade—are alleged to "resid[e] in" New York, and are therefore likely citizens of the State of New York. Thus, if any one of Eykyn's partners is a citizen of New York, then complete diversity appears to be lacking.  However, this Court has federal question jurisdiction under 28 U.S.C. § 1331 because of the RICO claims and, therefore, exercises supplemental jurisdiction over the remaining causes of action under 28 U.S.C. § 1367(a).

[2] The following facts are taken from the Amended Complaint, the allegations of which are assumed true for the purposes of this motion.

"[s]cheme" began in the late 1980s.  (¶ 29.)  That is when Rosales and José Diaz found Qian, an unknown but highly talented artist, painting portraits on the street in New York.  Rosales and José Diaz paid Qian to create paintings that mimic the styles of well-known abstract impressionists.  José Diaz forged the signatures of the famous artists on Qian's paintings and treated the canvasses with tea bags and hair dryers to make the paintings appear older.  By all accounts, Qian was extraordinarily adept at mimicry.  The scheme was quite successful.

In the mid-1990s, Andrade, then an employee of Knoedler, introduced Rosales to Freedman, who was then President of Knoedler.  Andrade described Rosales as a "very good friend."  (¶ 35.)  Knoedler, at Freedman's direction, began to buy paintings—all of which turned out to be counterfeit—from Rosales.  Rosales provided false provenance stories for each.  Two paintings, for example, were purportedly by Richard Diebenkorn.  In early 1994, Diebenkorn's widow and his son-in-law told Freedman that the paintings were forgeries.  Freedman and Knoedler continued to market them nonetheless.

Later in 1994, Rosales told Freedman that she had access to a previously undiscovered collection of paintings by Mark Rothko, Jackson Pollock, Willem de Kooning, Robert Motherwell, Clyfford Still, and Barnett Newman.  The paintings, according to Rosales, were acquired in the mid-twentieth century—Rosales wavered on the precise dates—by an anonymous collector (Mr. X) who lived in Switzerland and Mexico and whom Rosales had met as a child.  Rosales had no corroborating documents to support the provenance of the collection.  Instead she explained that Mr. X paid in cash and that Mr. X Jr. likely destroyed all written correspondence between Mr. X and the artists.  Throughout the rest of the 1990s, Knoedler and Freedman bought at least 25 paintings from Rosales.

By 2000 or so, Freedman grew suspicious.  "Apparently recognizing it would have been highly unlikely, if not physically impossible, for Mr. X to have purchased the works directly

from each of the artists," Freedman told Rosales that she "'surmised' that Mr. X instead had

acquired the works through an intermediary, Alfonso Ossorio (an artist and collector)."  (¶ 48.)

Rosales later told Freedman that "Mr. X, Jr. had confirmed Freedman's conjecture."  (*Id.*)

Knoedler nonetheless retained experts to test its veracity.  The experts "found no evidence

linking Ossorio to Mr. X, to the Rosales collection, or to any of the works in it."  (¶ 49.)   This

did not stop Freedman and Knoedler from using the purported Ossorio connection in their

marketing materials for the Rosales collection.

In 2001, Freedman and Knoedler used the Ossorio story to sell a fake Jackson Pollock to

Jack Levy, a Wall Street executive.  But on October 9, 2003, the International Foundation for Art

Research ("IFAR") sent Knoedler a report outlining a number of "very convincing . . . negatives"

concerning the provenance of the purported Pollock.  (¶ 58.)  IFAR concluded that it was

"inconceivable that the Pollock had passed through Ossorio's hands but had never been added to

the Pollock *catalogue raisonné*."[3]  (*Id.*)  Because the contract between Knoedler and Levy

required that Knoedler repurchase the painting if it could not be authenticated, Knoedler was

forced to repurchase the suspect Pollock.  Despite its "inconceivable" provenance, Knoedler later

resold the same painting to David Mirvish, a Canadian gallerist.  (*Id.*)

Once the Ossorio story had been discredited, Knoedler and Freedman went back to the

drawing board.  Andrade had been a close friend of the late David Herbert, a New York art

dealer, and had served as the executor of Herbert's estate.  Andrade, in a meeting with Freedman

and other Knoedler employees, claimed that "he had introduced Rosales to Herbert before

Herbert's death in 1995."  (¶ 66.)  By 2004, Knoedler was informing customers that Herbert, not

Ossorio, had acted as the intermediary between the artists in the Rosales collection and Mr. X.

---

[3] A *catalogue raisonné* is an authoritative list of works by an artist.

4

Eventually, in other litigation related to the Knoedler Gallery, Andrade admitted that he had no documents linking Herbert to Mr. X and that he had never met anyone who fit the description of Mr. X.  In 2007, the Dedalus Foundation ("Dedalus"), an art group, examined seven Motherwells from the Rosales collection.  Freedman told Rosales that Dedalus concluded that all seven Motherwells were "false, illegal, or part of a dishonest scheme."  (¶ 84.)  Freedman demanded that Rosales provide a "bona fide defense" to these allegations.  (*Id.*)  Rosales confirmed that she was confident in the provenance of the paintings and that Mr. X Jr. had confirmed that Herbert had served as the intermediary for Mr. X.  But Rosales refused to sign an updated authenticity statement and refused to ask Mr. X Jr. for any further evidence of the paintings' provenance because she feared that this "might raise his hackles" and she "did not want to jeopardize the relationship by pressuring him."  (¶ 85.)  Although Freedman, Knoedler, Rosales, and Andrade all knew about the Dedalus investigation as early as 2008, Dedalus did not release its findings to the public until 2011.  Knoedler continued to market the Rosales collection in the interim.

In March 2008, Rosales consigned *Untitled (Orange, Red, and Blue)* ("the Painting") to Knoedler.  Freedman noted that "although the Painting came from Mr. X's collection, it was owned by Rosales herself."  (¶ 89.)  In a "departure from its previous practices," Knoedler decided to sell the Painting anonymously.  It marketed the Painting through Wick, who offered it to Eykyn, a New York- and London-based art gallery, which contacted its client, Fertitta.  On April 7, 2008, Wick sent Eykyn an email saying that the Painting was "acquired through David Herbert, New York, either 1959 or 1960 for Private Collection Switzerland [*sic*]" and that it passed to the current owner "by descent."  (¶ 94.)  Wick wrote:

> The work has been viewed by the catalogue raisonné team [at the National Gallery of Art] and it is being considered for inclusion in the catalogue . . . .  I confirm that this work has been submitted to the team, all is perfectly fine, otherwise I would not want to be involved with it.  For this I stand with my name as a Rothko scholar.  Besides this, the work was submitted to Christopher Rothko

5

[Mark's son], who as we all are, was enthusiastic about it and the pristine wonderfully fresh condition.

(*Id.* (alterations omitted).)

After some haggling among Eykyn, Wick, and Fertitta, Wick told Eykyn that the undisclosed seller would accept no less than $7.2 million for the Painting.  Eykyn accepted the offer on Fertitta's behalf.  Fertitta bought the painting through Gurr Johns, another gallery, for tax purposes.  Kraft sold the painting on behalf of the "undisclosed seller."  Knoedler's records indicate that "Knoedler was selling the Painting on consignment for Rosales, who was to receive $4.55 million of the sales proceeds." (¶ 110.)  Wick received $150,000 from Fertitta and $300,000 from Knoedler.  (Fertitta was not told about the $300,000 commission.)  The bill of sale contract, signed by Kraft and Gurr Johns, provided that Kraft must disclose the identity of the seller in the event of a bona fide challenge to the "attribution, provenance, and description" of the Painting. (¶ 155.)  It also provided that Kraft warranted the authenticity of the Painting and agreed to indemnify Gurr Johns for losses stemming from false provenance.

By 2009, the United States Attorney for the Southern District of New York was investigating Knoedler and the sale of works from the Rosales collection.  After receiving subpoenas and learning of Freedman's suspected involvement in fraudulent sales, Hammer, Freedman's sole supervisor at Knoedler, immediately fired Freedman. Deprived of the revenue from the Rosales collection, Knoedler started rapidly losing money and abruptly closed its doors in 2011.

Fertitta sold the Painting to an undisclosed buyer in March 2011.  Shortly thereafter, an article in *The Art Newspaper* revealed that the Painting was most likely a forgery.  When Fertitta read the article, he agreed to repurchase the painting from the

6

unknown buyer for $8.5 million.  He promptly contacted Kraft and demanded that he

reveal the identity of his client.  Kraft has so far refused to do so.  Gurr Johns assigned its

claims to Fertitta, who brought this lawsuit on April 1, 2014.

## II.    Discussion

Andrade, Kraft, and Wick have moved under Rule 12(b)(6) to dismiss the Amended

Complaint.  Andrade argues that the Amended Complaint fails adequately to plead causes of

action for RICO, RICO conspiracy, aiding and abetting fraud, and conspiracy to commit fraud,

because the Amended Complaint fails plausibly to allege (1) that he was aware of and involved

in the fraudulent scheme and (2) that his conduct satisfied the interstate mailing and wiring

requirements of the RICO cause of action.[4]  Kraft argues that the Amended Complaint fails

because (1) the breach of warranty claim is untimely; (2) Plaintiffs have not shown damages

sufficient to state a breach of contract claim; (3) the rescission claim is procedurally

incompatible with the other claims; (4) the fraud and fraudulent concealment claims are

inadequately pleaded; and (5) the indemnification claim fails because the indemnitee did not

suffer losses.  Wick joins Kraft's argument on the breach of warranty claim, argues that he was

not a party to the warranty and indemnification agreements, and joins Kraft's argument on the

rescission claim.

### A.    Legal Standard

To survive a motion to dismiss under Federal Rule 12(b)(6), a complaint "must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 570 (2007)).  The standard of "facial plausibility" is met when "the plaintiff pleads factual

---

[4] Plaintiffs have agreed to withdraw their fraud and fraudulent concealment claims against
Andrade.

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility is distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 556) (internal quotation marks omitted). At the same time, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotation mark omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

On a motion to dismiss, a court may properly consider documents attached to the complaint or incorporated in it by reference. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)). The court may also rely on documents "integral" to the complaint. *Id.* (internal quotation marks omitted).

**B.    Andrade**

Andrade moves to dismiss the RICO, RICO conspiracy, aiding and abetting fraud, and conspiracy to commit fraud claims against him. He also asks that Plaintiffs be made to pay his attorney's fees for defending against fraud and fraudulent concealment claims that have since been withdrawn.

**1.    RICO**

A private cause of action under RICO requires that the plaintiff allege: "(1) the defendant's violation of 18 U.S.C. § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 283 (2d Cir. 2006) (internal quotation marks and alteration omitted); *see also* 18

U.S.C. § 1964(c) (providing a cause of action for "[a]ny person injured in his business or property by reason of a violation" of Section 1962).  An underlying violation of RICO occurs when "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, . . . conduct[s] or participate[s], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).  A plaintiff, then, must allege injury, causation, and the following elements: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983); *accord De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 299 (S.D.N.Y. 2013).  Plaintiffs here allege that the predicate acts were mail fraud and wire fraud.  18 U.S.C. §§ 1341, 1343.  Andrade contends that (1) he did not commit those predicate acts and (2) the Amended Complaint has not adequately alleged scienter on his part.  He does not challenge the existence of an enterprise.

Andrade made these arguments in another case relating to sales from the Rosales collection.  In *De Sole*, the plaintiffs alleged that Andrade was a participant in a RICO enterprise centered around the Knoedler Gallery.  Andrade argued that the mail and wire fraud causes of action did not allege that he used the interstate mails or wires in connection with the alleged RICO enterprise.  This argument, as Judge Gardephe held, is without merit. *See* 974 F. Supp. 2d at 308.  In *City of New York v. Smokes-Spirits.com., Inc.*, 541 F.3d 425, 446 (2d Cir. 2008), the Second Circuit squarely held that a "defendant commits wire fraud where he was one of the participants in a fraudulent scheme which was furthered by the use of interstate transmission facilities."  *Id.* (internal citations and quotation marks omitted).  Here, as in *De Sole*, Plaintiffs have alleged that Andrade participated in a scheme to sell fraudulent art, which scheme was

clearly furthered by the use of interstate mails and wires.  Nonetheless, Andrade argues that,

because the *Smokes-Spirits* case relied on dicta from an earlier case and because it actually

requires that the defendant *direct* the enterprise to use the mails or wires, it does not control here.

These arguments are meritless.

Andrade's argument regarding scienter fares no better.  The Amended Complaint

alleges (1) that he introduced Rosales to Freedman and encouraged the latter to buy the former's

fraudulent artwork and (2) that he helped Freedman come up with the story that Herbert served

as the intermediary for Mr. X.  Similarly, there are abundant allegations that Andrade

participated in selling artwork under very suspicious circumstances.  It is therefore plausible that

he knew the art was fake.  Andrade's motion to dismiss the RICO claim is denied.

## 2.    RICO Conspiracy

"RICO's conspiracy provision . . . proscribes an agreement to conduct or to participate

. . . in the conduct of [an] enterprise's affairs through a pattern of racketeering activity."  *United

States v. Pizzonia*, 577 F.3d 455, 462 (2d Cir. 2009).  A RICO conspiracy claim requires a

defendant to *agree* to participate "'in a charged enterprise's affairs' through a pattern of

racketeering, 'not a conspiracy to commit predicate acts.'"  *Id.* at 463 (quoting *United States v.

Persico*, 832 F.2d 705, 713 (2d Cir. 1987)); *see also De Sole*, 974 F. Supp. 2d at 310–11.

Andrade contends that the RICO conspiracy claim must be dismissed because (1) the substantive

RICO claim fails and (2) the Amended Complaint fails to "identify the predicate acts that Mr.

Andrade and the other defendants purportedly agreed to commit."  (Dkt. No. 43, Memorandum

of Law in Support of Jaime Andrade's Motion to Dismiss, at 14 n.5.)  The first argument is

without merit because the RICO claim has survived.  The second argument is without merit

because RICO conspiracy does not require that the defendant agree to commit any predicate acts;

rather, it requires only that he agree to join an enterprise with knowledge that predicate acts will

be committed by some member of the enterprise.  *De Sole*, 974 F. Supp. 2d at 311; *see also*

*United States v. Mayes*, No. 12-CR-385 (ARR), 2014 WL 25569 (E.D.N.Y. Jan. 2, 2014).  Even

if the standard were as Andrade describes it, Plaintiffs have sufficiently pleaded RICO

conspiracy: they have alleged a plausible circumstantial case that Andrade agreed to participate

in a scheme to sell fraudulent artwork.  Andrade's motion to dismiss the RICO conspiracy claim

is denied.

### 3.    Aiding and Abetting Fraud

A claim for aiding and abetting fraud under New York law requires allegations "'(1) that

an independent wrong exist; (2) that the aider or abettor knows of that wrong's existence; and (3)

that substantial assistance be given in effecting that wrong.'"  *Adelphia Recovery Trust v. Bank*

*of Am., N.A.*, 624 F. Supp. 2d 292, 312 (S.D.N.Y. 2009) (quoting *Landy v. Fed. Deposit Ins.*

*Corp.*, 486 F.2d 139, 162–163 (3d Cir. 1973)).  As Judge Gardephe noted in *De Sole*, "[t]o meet

Rule 9(b)['s] pleading requirements, a claim for aiding and abetting fraud requires plaintiff to

plead facts showing the existence of a fraud, defendant's knowledge of the fraud, and that the

defendant provided substantial assistance to advance the fraud's commission."  *De Sole*, 974 F.

Supp. 2d at 316 (internal quotation marks and citations omitted).  Andrade challenges the second

and third elements.  Neither challenge has merit.  The second element—knowledge of the

fraud—is properly pleaded by facts showing that Andrade knew or was deliberately ignorant of

the spurious provenance of the Painting: *inter alia*, that he knew that the story about David

Herbert, his longtime companion, of whose estate he served as executor, was false.  The third

element is satisfied by facts that, if true, show that Andrade introduced Rosales to Freedman

knowing that the former dealt in fraudulent art and that Andrade helped Freedman come up with

the story about Herbert.  Andrade's motion to dismiss this claim is denied.

### 4.      Conspiracy to Commit Fraud

"To plead a valid cause of action for conspiracy under New York law, a plaintiff must allege the primary tort and four elements: (a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury." *De Sole*, 974 F. Supp. 2d at 315 (quoting *Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir.1986)).  Andrade challenges the overt act requirement, arguing that the Amended Complaint does not plead any factual content regarding his actual participation in the fraudulent scheme.  But, as described in greater detail above, the Amended Complaint pleads facts sufficient to give rise to, at least, the reasonable inference that Andrade assisted in the fraud by introducing Rosales to Freedman and helping with the Herbert story.  Andrade's motion to dismiss this claim is denied. [5]

### 5.      Attorney's Fees

Andrade has asked that Plaintiffs be made to pay his attorney's fees for defending the now-withdrawn fraud claims.  The Court reserves decision on this request.  The parties are ordered to meet and confer to discuss a resolution of this request.  If Plaintiffs and Andrade cannot reach agreement, Andrade may renew his request.

### C.      Kraft

Kraft moves to dismiss the breach of warranty, breach of contract, fraud, fraudulent concealment, aiding and abetting fraud, indemnification, and rescission claims against him.

### 1.      Breach of Warranty

In the bill of sale, Kraft warranted the authenticity of the painting.  Plaintiffs now allege that the painting was inauthentic.  But Kraft argues that the breach of warranty claim against him

---

[5] Because Andrade's motion is denied in its entirety, the Court need not—and does not—address Plaintiffs' contention that the motion to dismiss is untimely.

is untimely because it was filed two years after the expiration of New York's statute of limitations for breach of warranty claims.  Plaintiffs respond by arguing that the statute of limitations should be tolled because (1) Kraft has actively concealed the fraud since the delivery of the painting, (2) the bill of sale explicitly extended performance past the date of delivery, and (3) the fraud is self-concealing.

The breach of warranty claim arises under New York law and, therefore, this Court applies both New York's statute of limitations and its equitable tolling doctrine.  *See Statistical Phone Philly v. NYNEX Corp.*, 116 F. Supp. 2d 468, 482 (S.D.N.Y. 2000) (Chin, J.) (citing *Meridien Int'l Bank Ltd. v. Gov't of Republic of Liberia*, 23 F. Supp. 2d 439, 446 (S.D.N.Y. 1998)).  A breach of warranty claim is governed by the New York Uniform Commercial Code's ("N.Y.U.C.C.") four-year statute of limitations.  *E.g.*, *Statler v. Dell, Inc.*, 775 F. Supp. 2d 474, 481 (E.D.N.Y. 2011) (citing N.Y.U.C.C. Law § 2-725 (McKinney)).  Plaintiffs agree that the cause of action "accru[ed]" when the painting was delivered and do not contend that the N.Y.U.C.C.'s tolling provision applies here.  Instead, they argue that New York's equitable tolling doctrine excuses their failure to file within four years of receiving the painting.

Under New York's equitable tolling doctrine,[6] a defendant is estopped from pleading a statute of limitations defense if the "plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action."  *Simcuski v. Saeli*, 44 N.Y.2d 442, 449 (1978).  "For the doctrine to apply, a plaintiff may not rely on the same act that forms the basis for the claim—the later fraudulent misrepresentation must be for the purpose of concealing the former tort."  *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 491 (2007) (citing *Zumpano v. Quinn*, 6 N.Y.3d 666, 674 (2006); *Rizk v. Cohen*, 73 N.Y.2d 98, 105–106 (1989)).

---

[6] New York does not distinguish between equitable tolling and equitable estoppel.  *See Meridien*, 23 F. Supp. 2d at 446 n.4.

Plaintiffs first argue that several of Kraft's acts after the sale constitute fraudulent concealment.  First, they argue that because *Wick* continued to claim that the Painting was authentic after the sale and offered to sell other fraudulent paintings to Fertitta, *Kraft* fraudulently concealed the cause of action.  Even if Wick's acts constituted fraudulent concealment, and even if it were true that Wick was Kraft's undisclosed principal, there is no plausible allegation that Wick's statements are actually chargeable to Kraft.  Kraft's agency concerned only the sale of the Painting; it did not concern the sale of any other works.  Second, Plaintiffs argue that Kraft's ongoing failure to disclose the identity of his client is itself fraudulent concealment.  This argument fails because to constitute fraudulent concealment a defendant's action must deprive the plaintiff of the information necessary to *bring* the cause of action; the defendant need not deprive the plaintiff of all the information she needs to *win* the cause of action.  *E.g.*, *Statler*, 775 F. Supp. 2d at 483 ("When deciding whether to toll the running of the statute of limitations, the issue is not whether Plaintiff was in possession of all of the information necessary to prevail on his claims, but whether plaintiff had enough information to commence a lawsuit.")  Plaintiffs clearly have enough information to bring the cause of action without knowing the name of Kraft's client: they have already sued.

Next, Plaintiffs argue that Kraft's warranty explicitly extends to the present because it contains a requirement that Kraft disclose the identity of his client whenever the Painting's provenance is called into question.  For a warranty to apply later than four years after delivery of the warranted goods, a contract must "*explicitly* extend" the warranty.  *Rosen v. Spanierman*, 894 F.2d 28, 31 (2d Cir. 1990) (emphasis in original).  The bill of sale creates an ongoing obligation to disclose the identity of the seller; it does not create an ongoing warranty, explicitly or otherwise.  Plaintiffs' argument on this point is without merit.

14

Finally, Plaintiffs argue that Kraft's fraud was, by its nature, self-concealing.  Under federal law, for example, "equitable tolling generally has two elements, (successful) concealment by defendant and diligence by plaintiff, and second, that a defendant who contrives to commit a wrong in such a manner as to conceal the very existence of a cause of action, and who misleads plaintiff in the course of committing the wrong, may be found to have concealed the wrong." *Hobson v. Wilson*, 737 F.2d 1, 33 (D.C. Cir. 1984) (Edwards, J.), *overruled in part on other grounds by Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163 (1993); *see also Bailey v. Glover*, 88 U.S. 342, 349 (1874).  The application of this second element—wrongs that are "self-concealing," *Hobson*, 737 F.2d at 33 n.103—to New York law is less than clear.  In *De Sole*, Judge Gardephe held that if "the wrong itself was of such a nature as to be self-concealing," the plaintiff could toll the statute of limitations until she discovered the cause of action.  *De Sole*, 974 F. Supp. 2d at 318–19 (quoting *State of New York v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988)).  But in *Ross*, the New York Court of Appeals squarely held that "[f]or the doctrine to apply, a plaintiff may not rely on the same act that forms the basis for the claim—the later fraudulent misrepresentation must be for the purpose of concealing the former tort."  *Ross*, 8 N.Y.3d at 491.  Similarly, in *Rosen*, the Second Circuit did not equitably toll New York's statute of limitations for breach of warranty in a case where the plaintiffs contended that they had been sold a forged painting, despite the fact that they did not know—and likely could not have known[7]—that the painting was a forgery when they received it.

---

[7] *Rosen*, in fact, treats the defect in the painting as though it were discoverable at the time of delivery through measures that are not "extraordinary."  *Rosen*, 894 F.2d at 29 ("While we would hesitate to deem the alleged defect here readily discoverable if extraordinary measures were required to detect the flaw, a painting's lack of authenticity is readily apparent to the trained eye of an art expert.").  Thus, the court's eliding of the self-concealing fraud doctrine could fairly be regarded as dicta.  But the *Rosen* case nonetheless controls this one: on materially identical facts, the Second Circuit declined to apply equitable tolling to the New York U.C.C.'s statute of limitations.

*Rosen*, 894 F.2d at 29. *De Sole* and *Hendrickson*, then, would seem to be in tension with *Rosen* and *Ross*: is the statute of limitations tolled for self-concealing frauds or must the plaintiff allege some additional fraudulent act?

But these cases can be reconciled with a sensible distinction: the self-concealing fraud doctrine applies—if it applies at all[8]—to ordinary fraud claims but does not apply to breach of warranty claims. *Hendrickson* was an antitrust case decided under federal law; *Rosen* was a breach of warranty claim decided under New York law. And this distinction makes good sense. The statute of limitations for a breach of warranty claim is, in effect, a default rule on the duration of a contractual warranty. Absent *express* language to the contrary, warranties in New York are expected to last only four years. But the parties are free to bargain for more or less coverage. In a fraud case, no such logic applies. Tolling the statute of limitations in a breach of warranty action for self-concealing breaches would render warranties for the authenticity of goods essentially infinite and would effectively disable the parties from bargaining for more or less warranty coverage. This is unlikely to be what New York's legislature intended.

In any event, this case is controlled by *Rosen*. There, the Second Circuit, on facts materially indistinguishable from the facts here, held that the statute of limitations was not tolled. *Rosen*, 894 F.2d at 29. Kraft's motion to dismiss the breach of warranty claim is therefore granted.

### 2. Breach of Contract

Plaintiffs claim that Kraft breached their contract by failing to disclose the identity of his client. Under New York law, a breach of contract claim requires proof of "the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her

---

[8] *Ross* was a tort case, not a warranty case. Thus, to the extent that New York rejects the self-concealing fraud doctrine altogether, the Court does not apply the doctrine here.

contractual obligations, and damages resulting from the breach." *Dee v. Rakower*, 976 N.Y.S.2d 470, 474 (App. Div. 2d Dep't 2013) (internal citations omitted).  Kraft challenges only the final element.  He contends that, because many independent events must occur before the Plaintiffs can actually recover money from the unknown seller, the right to know that seller's identity is of insufficient value to constitute "damages" within the meaning of New York law. *Id.*  This argument is meritless.  The mere fact that the value of the information is not immediately quantifiable does not render that information worthless.  Further, the ability to sue and recover money from the unknown seller is not the only value of knowing that person's identity.  Perhaps Fertitta simply would like to know who has defrauded him.  That is his right under the contract. Kraft has denied him that right.  Kraft's motion to dismiss the breach of contract claim is denied.

### 3.   Indemnification

The contract between Kraft and Gurr Johns provides that Kraft will indemnify Gurr Johns for any losses it incurred in connection with the Painting.  Gurr Johns has assigned all of its claims to Plaintiffs.  Kraft moves to dismiss on the ground that Gurr Johns did not suffer any losses because Fertitta and Eykyn have not sued it.  This argument is unavailing.  The mere fact that Eykyn, Gurr Johns, and Fertitta are cooperating in this action does not mean that Gurr Johns is not entitled to indemnification.  Gurr Johns is required to make its buyers whole for their losses in connection with the Painting.  Plaintiffs stand in Gurr John's shoes because of the assignment.  Therefore, Plaintiffs can sue for indemnification.  Kraft's motion to dismiss the indemnification claim is denied.

### 4.   Fraud

Plaintiffs allege that Kraft committed fraud when he warranted that the Painting passed "by descent" from Mr. X to Mr. X Jr. knowing that this was false.  Plaintiffs contend that Kraft must have known that this statement was false because he could not have believed that his client,

whoever he was, actually was the son of the collector who originally purchased the Painting.  To plead a fraud claim in New York, "a plaintiff must [allege] that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance."  *Banque Arabe et Internationale D'Investissement v. Md. Nat. Bank*, 57 F.3d 146, 153 (2d Cir. 1995) (citing *Keywell Corp. v. Weinstein*, 33 F.3d 159 (2d Cir. 1994); *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir. 1987)).  Kraft challenges the first, second, and final requirements.

Kraft first contends that a fraud claim cannot be sustained against him because he did not make any misstatements.  But Kraft is alleged to have written, in the bill of sale agreement, that the Painting passed "by descent from" a "Private Collection . . . acquired from [Rothko] through David Herbert . . . ."  (¶ 106.)  This statement, Plaintiffs plausibly allege, was false.  Next, Kraft contends that the Plaintiffs have not pleaded that he acted with scienter.  The Plaintiffs' allegations, though, plausibly suggest that Kraft could not have believed that the statement as to the Painting's provenance was true because, at the very least, he knew that whomever he was representing *was not* Mr. X. Jr.  Finally, Kraft contends that Gurr Johns has not been damaged.  This is meritless for the same reason that Kraft's argument regarding indemnification is meritless.  Kraft's motion to dismiss the fraud claim is denied.

### 5.   Fraudulent Concealment

Plaintiffs allege that Kraft committed the tort of fraudulent concealment when he failed to disclose that the painting was not a Rothko and that the owner was not, in fact, the son of a Swiss art collector.  Kraft argues that this claim fails because Kraft did not owe a fiduciary duty to Gurr Johns and because Kraft did not have access to information that Gurr Johns lacked.

To plead the tort of fraudulent concealment under New York law, a Plaintiff must state the elements of the tort of fraud, as well as a "duty to disclose material information." *Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 585 (S.D.N.Y. 2008) (citations omitted); *see also Tuosto v. Philip Morris USA Inc.*, 672 F. Supp. 2d 350, 363 (S.D.N.Y. 2009). Kraft's challenges to the other elements of fraud are addressed above; only his challenge to the final element—a duty to disclose—remains to be addressed. Both of Kraft's arguments are unavailing. First, the Complaint clearly alleges that Kraft had information that Gurr Johns did not have—namely, the true identity of the owner. Second, although Kraft is correct that he did not owe a fiduciary duty to Gurr Johns, he is incorrect that he did not owe *any* duty to Gurr Johns. A duty to disclose information can arise under New York law where "(1) there is a fiduciary relationship between the parties; (2) one party makes a partial or ambiguous statement that requires additional disclosure to avoid misleading the other party; *or* (3) one party to a transaction possesses superior knowledge of the facts not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Bavaria Int'l Aircraft Leasing GmbH v. Clayton, Dubilier & Rice, Inc.*, No. 03-cv-0377 (NRB), 2003 WL 21767739, at *6 (S.D.N.Y. July 30, 2003) (emphasis added) (internal quotation marks and citations omitted); *see also Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1484 (2d Cir. 1995) ("In the absence of a fiduciary relationship, a duty to disclose may arise if: (1) one party makes a partial or ambiguous statement that requires additional disclosure to avoid misleading the other party; or (2) one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.") (internal citations and quotation marks omitted). The Amended Complaint alleges that Kraft (1) had access to information that Gurr Johns did not (the true identity of the owner) and knew that Gurr Johns was acting on mistaken knowledge, and (2) made partial representations about the painting that at least required further

information to render them not misleading.  Kraft's motion to dismiss the fraudulent

concealment claim is denied.

### 6.      Aiding and Abetting Fraud

Plaintiffs allege that Kraft aided and abetted several of the other defendants in their

commission of fraud.

> In order to plead properly a claim for aiding and abetting fraud, the complaint
> must allege: (1) the existence of an underlying fraud; (2) knowledge of this fraud
> on the part of the aider and abettor; and (3) substantial assistance by the aider and
> abettor in achievement of the fraud.  Actual knowledge of the fraud may be
> averred generally.  Substantial assistance exists where (1) a defendant
> affirmatively assists, helps conceal, or by virtue of failing to act when required to
> do so enables the fraud to proceed, and (2) the actions of the aider/abettor
> proximately caused the harm on which the primary liability is predicated.

*Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.*, 883 N.Y.S.2d 486, 489 (App.

Div. 1st Dep't 2009) (internal quotation marks and citations omitted).  Kraft contends that this

claim must be dismissed because the Amended Complaint alleges neither that he knew about nor

substantially assisted the alleged fraud.  Both of Kraft's contentions are without merit because

(1) the Amended Complaint plausibly alleges that Kraft knew that the sale was fraudulent and

(2) under New York law, a party may be liable for aiding and abetting fraud when he

incorporates fraudulent statements into a document that he prepares.  *E.g.*, *Mateo v. Senterfitt*,

918 N.Y.S.2d 438 (App. Div. 1st Dep't 2011).  Kraft's motion to dismiss the aiding and abetting

fraud claim is denied.

### 7.      Rescission

Finally, Plaintiffs assert a cause of action for rescission of the contract against Kraft.

Under New York law, rescission "is an extraordinary remedy, appropriate only when the breach

is found to be material and willful, or, if not willful, so substantial and fundamental as to strongly

tend to defeat the object of the parties in making the contract."  *Krumme v. WestPoint Stevens,*

*Inc.*, 238 F.3d 133, 143 (2d Cir. 2000) (quoting *Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir. 1980)).  Kraft moves to dismiss this claim on the ground that the status quo cannot be restored and because Plaintiffs have an adequate remedy at law.  Kraft's first contention is without merit because, despite the fact that the painting has been exchanged several times since the initial sale, Plaintiffs have clearly represented that they are willing and able to give it back in exchange for a return of the purchase price.  The mere fact that the tax benefits Plaintiffs realized by conducting the sale through Gurr Johns will not be remitted is insufficient to show, at least at the pleading stage, that the status quo is unavailable.  *See Deutsche Alt-A Sec. Mortgage Loan Trust, Series 2006-OA1 v. DB Structured Products, Inc.*, 958 F. Supp. 2d 488, 506 n.15 (S.D.N.Y. 2013) ("Defendant's argument that rescission here will not ensure that the 'status quo be substantially restored,' presents factual issues premature at th[e pleading] stage.")  Kraft's second contention is without merit because, although rescission is legally inconsistent with ordinary breach of contract remedies, courts in this District typically allow such claims to survive in the alternative at the pleading stage.  *Id.* at 506 ("[W]hether [Plaintiff] may seek equitable remedies requires the Court to make factual determinations for which there is no support in the record at this stage.") (quoting *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328, 340 (S.D.N.Y. 2012)) (summary judgment stage); *Assured Guar. Mun. Corp. v. UBS Real Estate Sec. Inc.*, No. 12-cv-1579 (HB), 2012 WL 3525613, at *7 (S.D.N.Y. Aug. 15, 2012) (rejecting defendant's argument that "sole remedy" repurchase obligation precluded an award of rescissory damages, ruling that "[i]t would be premature to strike a remedy at the pleadings stage"); *Ambac Assur. Corp. v. EMC Mortg. Corp.*, No. 08-cv-9464 (RMB) (MHD), 2009 WL 734073, at *2 (S.D.N.Y. Mar. 12, 2009) (denying motion to strike prayer for rescissory damages because "the relief provided for plaintiff's claims will be determined if any entitlement to remedies is proved"); *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 898 (2d Cir. 1976) ("Since the District

Judge sits as an equity judge in this rescission action, it is for the court to fashion the proper

remedy after all the relevant facts have been found.")).  *But see Mars Adver. Europe Ltd. v.*

*Young & Rubicam, Inc.*, No. 13-cv-0401 (CM), 2013 WL 1790896, at *10 (S.D.N.Y. Apr. 24,

2013) (holding on a motion to dismiss that "[r]escission is not an appropriate remedy in this

case").  Kraft's motion to dismiss the rescission claim is denied.

 **D.** **Wick**

  Wick moves to dismiss only the rescission, breach of warranty, and indemnification

claims against him.  Wick adopts Kraft's arguments with respect to the rescission claim; he does

not add any of his own.  Therefore, his motion to dismiss the rescission claim is denied for the

same reasons that Kraft's is denied.

  **1.** **Breach of Warranty**

  With respect to the breach of warranty claim, Wick adopts Kraft's arguments and adds

one of his own.  He argues that he cannot be held liable for breaching the warranty in the bill of

sale because he was not a "seller" within the meaning of N.Y.U.C.C. § 2-313.  Plaintiffs contend

that he was, at least in part, Kraft's principal and that the statute of limitations should be tolled

because he acted fraudulently to conceal the cause of action against him *after* the sale of the

painting.

  Wick's first contention is without merit because his intimate involvement in the deal

renders it plausible that he was one of Kraft's principals and, therefore, responsible for Kraft's

warranty under New York law.  *E.g.*, *Weil v. Murray*, 161 F. Supp. 2d 250, 259 (S.D.N.Y. 2001).

But, unlike Kraft's, Wick's contention that he did nothing to toll the statute of limitations *after*

the initial sale is unavailing because Wick, unlike Kraft, continued to communicate with

Plaintiffs well after the transaction.  In 2008, Wick tried to sell Fertitta another purported Rothko

by saying that it was a "perfect match" for the Painting and that "it seems as if [the two paintings

were] painted within a week [of each other]." (¶ 114.) These statements can plausibly be read to suggest that Wick was continuing to affirm the legitimacy of the Painting. Wick's motion to dismiss the breach of warranty claim is therefore denied.

### 2.   Indemnification

Wick adopts Kraft's argument with respect to the indemnification claim and adds only that he was not a party to the bill of sale and, therefore, cannot be held liable for breaching it. This argument is unavailing because it is plausible that he was one of Kraft's principals. Kraft signed the bill of sale. Therefore, it is plausible at this stage of the litigation that Wick is a party to the indemnification agreement. His motion to dismiss the indemnification claim is therefore denied.

## III.   Leave to Amend

Plaintiffs' proposed amendments relate only to Andrade's claims. Because these claims have survived, Plaintiffs' motion to amend is denied as moot.

## IV.   Conclusion

For the foregoing reasons, Andrade's motion to dismiss is DENIED, Kraft's motion to dismiss is GRANTED in part and DENIED in part, and Wick's motion to dismiss is DENIED. Plaintiffs' motion to amend is DENIED as moot. Plaintiffs' breach of warranty claim is dismissed as to Kraft. All other claims survive.

The Clerk of Court is directed to close the motions at Docket Nos. 30, 34, 37, 42, and 47.

SO ORDERED.

Dated: January 29, 2015
      New York, New York

_____
J. PAUL OETKEN
United States District Judge

23